**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MICHAELA BIED,**

                                        **Plaintiff,**

        **v.**                                                    **1:15-cv-1011 (TJM/DEP)**

**COUNTY OF RENSSELAER,**
**HUDSON VALLEY COMMUNITY COLLEGE,**
**WENDY A. MEEHAN f/k/a WENDY A. HUDY,**
**ALEXANDER J. POPOVICS,**
**HUDSON VALLEY COMMUNITY COLLEGE**
**DEPARTMENT OF PUBLIC SAFETY, and**
**AMANDA J. MILLER-KALBFIESH,**

                                        **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I.    INTRODUCTION**

        The Amended Complaint alleges claims under the Americans with Disabilities Act, 42

U.S.C. § 12132; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); 42

U.S.C. § 1983 (false arrest and malicious prosecution); and New York State law (false

arrest and imprisonment, malicious prosecution, intentional infliction of emotional distress,

and negligent infliction of emotional distress).  All claims arise from Defendants' alleged

conduct while Plaintiff was a student at Hudson Valley Community College ("HVCC").

        Defendants move for summary judgment seeking to dismiss all of Plaintiffs' claims,

dkt., # 55, and to strike Plaintiff's expert witness's report and preclude him from testifying at

trial.  Dkt. # 62.  Plaintiff opposes these motions.  For the reasons that follow, Defendants'
motion for summary judgment is granted in part and denied in part.  Defendants' motion to
strike Plaintiff's expert's report and precluded the expert from testifying at trial is denied.

## II.    STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed
facts in the light most favorable to the non-moving party, *see Scott v. Harris*, 127 S. Ct.
1769, 1776 (2007), and may grant summary judgment only where "there is no genuine
issue as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); *see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d
110, 116 (2d Cir. 2011).  When deciding a summary judgment motion, "[t]he court resolves
all ambiguities and draws all reasonable inferences against the moving party." *Villante v.
Vandyke*, No. 9:04CV759 FJS DRH, 2008 WL 163596, at *1 (N.D.N.Y. Jan. 15, 2008).

## III.    BACKGROUND

Unless indicated otherwise, the following are the relevant and material facts admitted
in the parties' Local Rule 7.1(a)(3) Statements of Material Facts ("SOMF"), or are supported
by one party and not properly disputed by the other.[1]  All facts are set forth in the light most
favorable to Plaintiff.

When Plaintiff was in high school at the Voorheesville Central School District, she
received an Individualized Education Plan that provided for accommodations for a learning
disability. Her accommodations included additional time to complete tests.  On April 24,

---

[1]With regard to many of Defendants' statements, Plaintiff enters denials based on semantics or the
wording used in a particular statement despite that the asserted fact is substantively supported by the record
evidence.  This type of gamesmanship is insufficient, and  serves to exponentially increase the time
necessary to review the summary judgment motion.

2013, Plaintiff submitted a Registration Form to HVCC's Learning Disabilities Services office.  This form indicated that her disability was characterized as "developmental delays in speech development, cognitive functioning and motor skills," and her functional limitation as "learning disability that impacts the processing of information."  Plaintiff's father testified that, to his knowledge, Plaintiff's cognitive impairment did not prevent her from understanding instructions although her "other diagnosed conditions" may cause her to take longer in processing information relative to instructions.  Def. Ex. 5, p. 31.

The Voorheesville Central School District Confidential Psychological Report ("Psychological Report ") that was provided to HVCC as part of Plaintiff's application indicates: "At the college level, teachers feel Michaela will need extra time to complete assignments, assistance with note taking and help with time management skills. Both in the world of work and in college, teachers feel that Michaela will continue to need support with social skills including making eye contact, speaking clearly and navigating social situations." Pl. Ex. A., p. 3.[2]  This report also indicates that in a telephone conversation with Plaintiff's

---

[2] The Amended Complaint asserts that Plaintiff "was learning disabled and suffered specifically from disabilities including, but not limited to, cognitive impairment and social pragmatic disorder." Am. Compl. ¶ 21. It also asserts that "HVCC had actual knowledge of the disabilities and recommended accommodations in the Voorheesville Psych Report when it accepted MICHAELA as a student," *id.* ¶ 26; that Professor Meehan was or should have been aware of Plaintiff's social pragmatic disorder and should have concluded that Plaintiff's conduct toward her (as discussed more fully in the text, *infra*) was a manifestation of Plaintiff's conditions and not an attempt to harass or stalk her, *id.* ¶¶ 38-60; and that Defendants Rensselaer County, Popovics, HVCC, HVCC Public Safety, and Miller-Kalbfiesh failed to conduct adequate investigations, including  inquiries into Plaintiff's disorders, and failed to "reasonably accommodate [Plaintiff's] disabilities," before issuing her warnings and ultimately arresting her for her conduct toward Prof. Meehan.  *Id.* ¶¶ 61-81; *see also id.*  ¶¶ 84-148.  Moreover, Plaintiff asserts in her Additional Statement of Material Facts: "The psycho-educational report provided to HVCC as part of plaintiff's application process noted at p. 3 that she did not know how to approach people and might have difficulty self-advocating at the college level, and at p. 11 assessed her pragmatic communication skills as significantly below her age mates, and as continuing to possess a language-based learning disability and processing disorder that impacts her reading and writing skills and her processing speed." Pl. Add. SOMF  SOMF ¶ 139.

While the Voorheesville Central School District Confidential Psychological Report indicates that
(continued...)

mother, Mrs. Bied stated that she feels Plaintiff will ultimately be able to achieve a four-year

college degree, but her "weaknesses include not knowing how to approach people and

having difficulty making friends." *Id.* Mrs. Bied also stated that Plaintiff "might have difficulty

self-advocating at the college level." *Id.*

The Psychological Report's Summary and Conclusion provides in pertinent part:

Michaela Bied, and 18-year, 10-month old, female has received special
education services since preschool. Initially, she received services for delays
in speech, motor and cognitive skills. In the primary grades, she exhibited
delays in reading and writing skills and, in the fourth grade her classification
was changed to Learning Disabled. Michaela also has a history of pragmatic
communication and social skill weaknesses which have impacted her socially.
. . . Michaela continues to be identified with the Learning Disability and has in
IEP which includes a period of resource room support every day. Psycho-
educational evaluation is being conducted at this time to provide updated
information regarding Michaela's abilities and skills, and to make
recommendations for support she will need as she transitions out of high
school.

On the current cognitive testing using the WAIS-IV, Michaela earned a Full
Scale IQ of 80 (9th percentile). However, Michaela displayed some significant
variability among subtest scores indicating that the Full Scale IQ is not a good
representation of Michaela's abilities. Michaela displayed relative strengths in
the area of long-term memory for factual information, working memory and
some perceptual reasoning abilities. Weaknesses are seen in the areas of
understanding of vocabulary, verbal associative reasoning ability and
processing speed.

Achievement testing found Michaela's math skills to fall in the Average range
and to be an area of personal strength. Reading and writing skills were in the
Average to Low Average range on this assessment. Qualitatively, Michaela
continues to have difficulties understanding inferential reading material, and
per report of her teachers, may need additional tutoring to grasp new
concepts. Although Michaela knows how to put sentences together and can

---

[2](...continued)
Plaintiff "has a history of pragmatic communication and social skill weaknesses which have impacted her
socially," it does not indicate that Plaintiff had been diagnosed with "social pragmatic disorder." Because of
the allegations and representations about Plaintiff's diagnoses and conditions, and because Plaintiff relies
upon inaccurate allegations in support of the claims in this matter, the Court finds it appropriate to provide
details regarding the cited content of the Psychological Report.

write an essay, teachers report that she has difficulty analyzing and synthesizing information into her papers and will continue to need some assistance with this process. Michaela's slow processing speed impacts all academic areas. Her fluency for all academic skills is well below age expectancies.

Some significant delays were seen in Michaela's daily living skills in both home and school settings on the Adaptive Behavior Assessment System. Michaela's pragmatic communication skills, self-care skills and home living skills are reported to be significantly below age mates. Michaela has a tendency to avert eye contact, and exhibits difficulties initiating and maintaining conversations, and making friends. Additionally, her speech can continue to be difficult for others to understand at times which adds to her communication issues. Michaela also possesses a more limited interest in her appearance and grooming and comparison to age mates. All of these are issues that Michaela will continue to have to learn how to handle as she enters the adult world, especially the world of work.

In summary, Michaela continues to possess a language-based learning disability and processing disorder that impacts her reading and writing skills and her processing speed. Michaela also continues to exhibit some vestiges of her earlier speech impairment in her articulation and she possesses some difficulty with pragmatic social skills. Michaela will continue to need support services to be successful at the college level. She may also need some support as she enters the world of work.

*Id.* pp. 10-11.

On May 8, 2013, before beginning classes at HVCC, Plaintiff signed a form acknowledging that she was to "[m]ake an appointment with Learning Disabilities Services during the first week of class to get your accommodation letters. These letters are the official record of your accommodations. You must deliver them in person to each of your instructors." Def. Ex. 14 (emphasis in original).

Plaintiff matriculated at HVCC in August of 2013. She enrolled in five courses in the fall 2013 semester, including Financial Accounting with Prof. Wendy Meehan (f/k/a Wendy Hudy). In the fall 2013 semester, Plaintiff received her accommodation letters, and, as is relevant here, delivered an accommodation letter to Prof. Meehan and obtained

accommodations in the Financial Accounting course taught by Prof. Meehan.[3]  According to

Deanne Martocci, Director for the Center for Access and Assistive Technology ("the CAAT")

at HVCC, there is a requirement at HVCC that a person with a disability, in order to receive

disability accommodations, submits a written accommodation form to each professor

teaching each class each semester.  Def. Ex. 13, pp.111-13.   Ms. Martocci further testified

that the requirement that a student personally deliver accommodation letters to each

professor served two important functions - it required the students to be responsible

self-advocates, and it offered them the opportunity to discuss their accommodations directly

with course instructors and to decide whether they wished to be accommodated in particular

courses. *Id.* pp. 113-14.   Ms. Martocci explained that each student plays a role in the

accommodation process at HVCC.  She indicated that, as adults in the college setting,

students are allowed to choose whether or not they want to use the accommodations they

are provided each semester.  *Id.* pp. 114, 121.  Plaintiff challenges the existence of this

policy because it is not contained in any written policy manual, and notes that Ms. Martocci

testified when questioned whether a student would be denied a disability accommodation if

the student failed to provide the written accommodation letter to a professor during a

semester:

---

[3] Plaintiff denies Defendants' assertion that Plaintiff delivered accommodations letters to each of her professors in the fall 2013 semester. *See* Pl. Resp. SOMF, ¶ 9.  Plaintiff's denial is because the accommodation letters for each of Plaintiff's fall 2013 classes (submitted by Plaintiff as Ex. HH) do not contain the respective professors' signatures. *See* Pl. Resp. SOMF, ¶ 9 & Pl. Add. SOMF ¶ 115.  Despite this denial, Plaintiff argues in her memorandum of law in opposition to summary judgment that "Academic Accommodation Forms for Plaintiff's first semester at HVCC, the fall of 2013, were submitted. Even though copies of the forms provided in discovery do not bear the signatures of either Plaintiff or her professors, Plaintiff received all accommodations requested." Pl. Mem. L. p. 2.  It is also worth noting that Plaintiff's father, who was very involved in the accommodations afforded Plaintiff, testified that it was his understanding that Plaintiff had more than one course where she was taking tests in the fall of 2013 and that she made arrangements to take all of her tests at the CAAT.  Def. Ex. 5, pp. 97-98.

So faculty has the ability, at any point, to work with any student and make alternative arrangements, regardless of disability. The form that the student with a disability is going to be delivering to their instructor clearly states that it's regarding the disability and there's certain accommodations that they are eligible for, so if a student, ... didn't turn in — didn't — chose not to get the accommodation form or had a conversation with their instructor, I would not be a part of it, but certainly the instructor could make arrangements with the student on their own.

*Id.* p. 113.

The accommodations afforded to Plaintiff in the fall 2013 semester were double time to complete timed examinations and in-class assignments; tests and quizzes administered in a distraction-reduced location; and permission to use a word processor with spell checking capabilities. The distraction-reduced location where Plaintiff was allowed to take tests and quizzes was at the CAAT.  With those accommodations, Plaintiff passed all of her classes in the fall 2013 semester, earning a 2.10 GPA, including a "B" in the Financial Accounting course taught by Prof. Meehan. Def. Ex. 40.

Plaintiff enrolled in four classes in the spring 2014 semester, including Principles of Marketing taught by Prof. Meehan.  Plaintiff was eligible for her same accommodations in the spring 2014 semester. Pl. Ex. II, pp. 120-121.  In December 2013, Plaintiff emailed Norina Dowd, CAAT Office Manager, asking whether she needed to "pick up accommodation letters" for that semester or if they were "just for the first semester."  Ms. Dowd responded: "At the start of each semester please see [Jennifer Miller] to get new forms as you have new classes each semester."  Def. Ex. 15.   At the start of the spring 2014 semester, Plaintiff did not pick up her accommodation letters for that semester, nor did she deliver them to her professors.  Def. Local Rule 7.1 Statement of Material Facts

7

("SOMF") ¶ 13.[4]

On January 28, 2014, February 3, 2014, and February 11, 2014, Plaintiff emailed Ms. Dowd regarding scheduling tests #1 and #2 for the Principles of Marketing class at the CAAT, and on each occasion Ms. Dowd replied that Plaintiff was "all set." Pl. Ex. LL. Plaintiff went to the CAAT to take these tests, but the tests had not been sent there. As indicated, at this point Plaintiff had not provided Prof. Meehan with an accommodation letter for that semester. Prof. Meehan testified that the tests were not initially sent to the CAAT because, without the accommodation letter presented to her, it would been contrary to HVCC protocol to send the tests. Pl. Ex. UU, p. 199. Prof. Meehan further testified: "I followed the normal rules, and our normal regulations and part of being a professor of a community college is empowering your students to complete work on their own, empowering themselves to be an individual, and part of that is to manage their lives, so a reminder was the path I chose to empower her to obtain her paperwork. . . . When I became an instructor at the college, I was instructed if a student has an accommodation and is electing to utilize those accommodations, they will provide you with the paperwork. At this point in time, I did not know if Michaela was electing to use the accommodations. Only Michaela knew if she was electing to use the accommodations." *Id.*, pp. 211-13. Prof. Meehan could not identify whether this regulation was contained in a rule book. *Id.* p. 212.

Prof. Meehan testified that after the class took the first test, she approached Plaintiff and told her that she needed to schedule a time with Prof. Meehan to take the missed test or present Prof. Meehan with paperwork from the CAAT so that Plaintiff could complete the

---

[4]Plaintiff disputes whether the advice from Ms. Dowd was sufficient to notify her that she needed to pick up the accommodation letters and distribute them to her professors each semester.

test there.  Pl. Ex. EE, p. 97; *see also* Pl. Ex. UU, p. 171.  When questioned why Prof.

Meehan did not "reach out" to the CAAT and inquire whether Plaintiff had an

accommodation letter that she had not turned in to Prof. Meehan, Prof. Meehan testified: "I

approached the student, which is protocol for us to do, to ask the student to provide me with

the documentation, the students are treated as adults by the college and we are to deal

directly with them to help them help themselves." Pl. Ex. UU, p. 200.  When Prof. Meehan

was asked to explain what she meant by "the students are treated as adults," Prof. Meehan

testified: "I mean, that they're responsible for all paperwork that is necessary for them to

get. I asked her for it and she led me to believe that she understood she needed it and, I

believe, for her to give it to me."  *Id.* p.  201.  When Prof. Meehan was asked whether she

treats her students as adults, or "as an adult with a disability," Prof. Meehan explained:

> I treat all my students the same, that they are all taught the same material,
> they are all extended every office hour, every tutoring session, every help that
> they would need, in addition to that, if Michaela needed an accommodation at
> the CAAT center, I spoke with her on more than one occasion, to ask her to
> provide me with that work, that paperwork, so that I could have her take
> advantage of the accommodation that she needed for the semester.

*Id.* pp. 202-03.

When asked whether she thought that Plaintiff did not understand that it was her

obligation to bring the accommodation letter to Prof. Meehan, Prof. Meehan testified: "I

believe that Michaela understands everything she does. She's a very intelligent girl."  *Id.* p.

201.  When questioned further why she did not email the CAAT herself to find out if Plaintiff

had accommodations and was electing to use them that semester, Prof. Meehan stated: "I

am not Michaela's parent, so it's not my job to email on behalf of the student. I don't speak

for students, I'm their professor." *Id.* p. 221.  She also indicated that it is not her function as

9

a student's advisor to speak for the student. *Id.*

Prof. Meehan caused an Early Alert e-mail and notification to be sent to Plaintiff on February 21, 2014, alerting Plaintiff to concerns about her "academic progress this semester."  Def. Ex. 16; Def. Ex. 5, pp. 76-77.  Plaintiff received the Early Alert e-mail, but did not tell her parents.  Plaintiff and Prof. Meehan exchanged a number of emails between February 21 and February 24, 2014 relative to this subject.   At 5:12 PM on February 21, Plaintiff sent an email to Prof. Meehan indicating: "This is the first time in a while since I've been on a computer. I have had a personal family situation come up these past couple weeks that I am getting really annoyed with. I will be back on Monday. Do you want me to give you a number you can reach me at or is there a number I could reach you at to discuss what is going on with me.  When you get this message could you please respond back to me ASAP I would appreciate it." Pl. Ex. H.   Prof. Meehan responded at 5:22 PM on February 21, indicating "I would love to talk to you but I have laryngitis right now so I don't have a voice. I will be at HVCC on Monday at 8:30 AM ... Do you want to meet me then? We'll work things out - I am here for you." *Id.*  On February 22, 2014 at 6:42 PM, Plaintiff emailed Prof. Meehan indicating "I won't know until tomorrow afternoon what time the person who is driving me wants to leave in the morning on Monday.  Would you like me to let you know if I can make it there at that time. When you get this message could you please respond back to me ASAP I would appreciate it." *Id.*  Prof. Meehan responded back at 6:54 PM on February 22, indicating "No problem, I will be in at 8:30.  I will either be in my office (Fitz 210) or in Brahan 205 ... See you Monday." *Id.*  On Sunday, February 23, 2014 at 8:31 PM, Plaintiff emailed Prof. Meehan indicating "My ride said that I'll be there a little

10

after 8:00. Where should I wait to talk to you. When you get this message could you please respond back to me ASAP I'd appreciate it." *Id.* Prof. Meehan responded back on February 24, 2014 at 8:34 AM indicating: "I am in Brahan 205 - come see me there." *Id.*

In a subsequent statement that Prof. Meehan provided to the HVCC Department of Public Safety, she indicates that on February 24, 2014, she found Plaintiff crying on the floor in the hallway of Brahan Hall. Def. Ex. 32. Prof. Meehan convinced Plaintiff to get up, and she walked with her to the HVCC Counseling Center, where Prof. Meehan arranged for Plaintiff to speak with a counselor. *Id.* Prof. Meehan indicates that during their walk to the Counseling Center, Plaintiff shared that her grandfather was in the hospital dying. Also during the walk, Prof. Meehan asked Plaintiff to "please submit her paperwork to the CAAT so she could get on track in Principles of Marketing." *Id.* Prof. Meehan indicates that Plaintiff spoke with a counselor and scheduled a second appointment, but to Prof. Meehan's knowledge Plaintiff did not keep that second appointment. *Id.* [5]

On March 4, 2014, Plaintiff gave Prof. Meehan her cell phone number, but represented that it was her mother's cell phone. Plaintiff contends that she did this because she wanted Prof. Meehan to call her mother on Plaintiff's phone. Prof. Meehan contends that Plaintiff did this so Plaintiff could obtain Prof. Meehan's telephone number when Prof. Meehan made a call thinking she was going to speak with Mrs. Bied.

---

[5]Plaintiff does not dispute that this encounter occurred, but questions the veracity of Prof. Meehan's statement because, in a School of Business Advisement Comment Sheet, Prof. Meehan indicates that Plaintiff told her on February 24, 2014 that she was having a lot of difficulty with the course load, that Plaintiff did not do the paperwork with the Disability Resource Center (presumably the accommodation letters), and that Plaintiff feels that "12 credits" should be the "ultimate max" for her. Pl. Ex. D. Prof. Meehan also indicates in this document that Plaintiff was "overwhelmed . . . and in tears" on November 24, *id.*, which, to Plaintiff, indicates that Plaintiff was not "crying" as Prof. Meehan represented in her statement to the Department of Public Safety. Pl. Resp. SOMF ¶ 17.

Prof. Meehan emailed Plaintiff on March 10, 2014, reminding her that her third test in

Principles of Marketing was March 11, and reminding her that she had missed two other

tests in the course.  Plaintiff did not provide Prof. Meehan with her accommodation letter

before March 11, and Plaintiff did not take Test #3 on this date.

On March 13, 2014, Prof. Meehan found Plaintiff facing a wall and crying, and called

HVCC Public Safety.  Plaintiff refused to go to the Counseling Center or the hospital, and

had to be picked up by her father.  This incident was Plaintiff's first interaction with HVCC

Public Safety.  At this point, Plaintiff's behaviors came to the attention of the HVCC Student

Behavioral Assessment Team ("SBAT").  Def. Ex. 13, pp. 64, 67-68.  The SBAT is a

committee formed in response to situations that happen nationally with students on college

campuses, such as the 2007 shooting at Virginia Polytechnic Institute and State University

in Blacksburg, Virginia.  *Id.* p. 64.  The committee is comprised of various individuals from

throughout the campus who assess student behavior and attempt to "head off any

situations that could occur negatively on campus." *Id.*  Defendant Alexander J. Popovics,

Vice President for Enrollment Management and Student Development at HVCC, is a

member of this team.  Pl. Ex. FF, p. 76; *see id.*, pp. 84-85.[6]   During a  SBAT meeting in

March 2014, Ms.  Martocci advised SBAT committee members that Plaintiff was "socially

awkward," and might have advised them that "she may have difficulty interacting socially

_____

[6]Dr. Popovics testified that the Student Behavioral Assessment Team is "concerned with assisting individuals who may be acting or exhibiting behavior that needs our assistance when it need some direction, such as an individual reported that goes to the counter at the registrar's office that is hollering, cursing, and exhibiting behavior that we would want to be aware of, to see if it's happening multiple times around campus, we would address that. If we happen to see a person who's stalking around the campus on a day like today, they're wearing a heavy coat, and they seem suspicious, we might want to say, that we ought to look into what is going on with that individual, and make sure that there are not presenting a danger to the college. Those are the types of examples that we would address."

with anyone on campus." Pl. Ex. II, pp. 67-68, 75-76.  There is no indication that the SBAT took any action with regard to Plaintiff at this time. *Id.*  p. 88.

Plaintiff and her mother met with Prof. Meehan on March 17, 2014.   During the March 17 meeting, Prof. Meehan, who was Plaintiff's faculty advisor, discussed with Plaintiff and Mrs. Bied that Plaintiff had not taken any of the tests in any of her classes,[7] including Principles of Marketing.  Prof. Meehan also told Plaintiff that before she could make up the missed tests, she would have to go to the CAAT office and pick up her accommodation letters.  Def. Ex. 2, p. 113.   After meeting with Prof. Meehan, Plaintiff and her mother decided Plaintiff would withdraw from her Managerial Accounting and Legal and Ethical Environment of Business classes, but remain enrolled in Prof. Meehan's class.  Plaintiff also remained enrolled in an English class where her grade was based on papers and no tests.

Plaintiff first picked up her accommodation letter for the Principles of Marketing course on March 19, 2014.  Def. SOMF ¶ 23.  However, it appears that Plaintiff did not deliver an accommodation letter to Prof. Meehan. Pl. Ex. UU, p. 214.  Nevertheless, Plaintiff received her accommodation to take her tests at the CAAT because Ms. Dowd contacted Prof. Meehan and told her that Plaintiff had accommodations allowing for tests at the CAAT for the spring 2014 semester and was electing to use these accommodations. *Id.* pp. 214-18.   Prof. Meehan testified that when she heard this, she said: "Great, let's get this girl started with her tests so she can catch up because I really wanted her to be successful." *Id.* p. 218.  When asked why she did not insist on Plaintiff delivering the accommodation form to her, Prof. Meehan explained: "Because I was extending --- I didn't want to make it any

---

[7] Plaintiff denies this statement on the basis that she was taking a English class that did not have tests.

13

harder for Michaela to get these tests scheduled. I didn't want to waste any more time." *Id.*
218-19

Prof. Meehan emailed Plaintiff on March 21 and March 26, 2014, to remind her that
she still needed to take three outstanding exams before the Principles of Marketing class
took test #4 the following week.  After consultation between Plaintiff and Professor Meehan,
it was decided that Plaintiff would complete tests #1, #2, and #3 by the close of business on
April 2, 2014 because the entire class was taking test #4 the following day.  However,
Plaintiff failed to complete these three exams by the April 2 deadline.

On April 7, Prof. Meehan granted Plaintiff what was characterized as "one last
extension," indicating that all tests given in the course to that point (tests #1, #2, #3, and #4)
would need to be completed by April 11, 2014.   Def. SOMF, ¶ 27.  These extended dates in
April 2014 were more than one month after the tests were administered to the class.[8]
Plaintiff took Test #1 on Monday, April 7, 2014, and took Test #2 on Wednesday, April 9,
2014. Pl. Add. SOMF ¶ 118.

On April 10, which was one day before a student could withdraw from a course
without penalty, Plaintiff's mother contacted Prof. Meehan and requested that she advise
Plaintiff what her grades were on tests #1 and #2 so Plaintiff could determine whether she
wanted to withdraw from Principles of Marketing.  Pl. Ex. HH, pp. 120-22.  Plaintiff's mother
also asked for an extension of time to take test  #4.  *Id.*  Plaintiff learned that she received
grades of 76 and 72 on the first two tests in Principles of Marketing. *Id.*   After learning this,
Plaintiff had a discussion with her father and it was agreed that she would stay in the course

---

[8]Principles of Marketing test #1 had been given to the class on February 6, test #2 had been given to
the class in late February, and test #3 had been given on March 11.

14

and take the remaining tests. *Id.* p. 120.  Plaintiff also received an email on April 10 indicating that she could take test #3 on Friday, April 11, and schedule an appointment to take tests #4 the following Monday, April 14. *Id.* p. 124.  Until Plaintiff received this email she was studying for both tests #3 and #4 which she thought she had to take on April 11. *Id.*

On April 11, when Plaintiff did not show up at the CAAT to take test #3, a CAAT representative called Plaintiff's mother who relayed the message to Plaintiff's father, Dr. Joseph Bied, M.D. Pl. Ex. HH, pp. 113-14, 116.   Dr. Bied called Ms. Martocci at the CAAT on April 11 and expressed concern with Prof. Meehan's demand that Plaintiff take four exams within one week. Pl. Ex. II, p. 104.   During this telephone call, Dr. Bied said to Ms. Martocci: "Don't you think that's kind of demanding of Michaela, who has a learning disability, to take that many tests in one week?" *Id.*  Ms. Martocci indicated that students with learning disabilities often take four tests during finals week, and without Plaintiff expressing to her that she was worried about taking the four tests she did not think that it was inappropriate. *Id.*  pp. 105-06. Dr. Bied stated that Plaintiff was not ready to take the tests because she was not finished studying for tests #3 and # 4.  Pl. Ex. HH, p. 117.  Ms. Martocci initially told Dr. Bied that Plaintiff had to show up by 3 PM to take test #3. *Id.*, p. 126.  Dr. Bied then stated: "Can't you accommodate [Plaintiff] and let her take the test, like, next week, so she has time over the weekend to complete her studying?" *Id.* pp. 126-27.  Ms. Martocci put Dr. Bied on hold and contacted Prof. Meehan. *Id.*  When Ms. Martocci returned to speaking with Dr. Bied, she indicated that Prof. Meehan said: "Okay, we'll let her take test number three on Monday and we are going to drop test number four." *Id.* p. 127.[9]

---

[9]Prof. Meehan had a policy that allowed students to drop the lowest test score in the course.

At the time of this conversation, Dr. Bied was driving his car and Plaintiff was in the

passenger's seat. *Id.* Dr. Bied testified:

> So I turned to Michaela and I said Michaela ... they're going to let you take test number three on Monday and they want you to drop test number four because there is a total of six test and they drop one of the exams, the one with the lowest grade. And Michaela was in agreement with that.
>
> She had already started studying for test number four. So I talked to [Ms. Martocci], I said I talked to Michaela she wants to take tests three and four. Well, Prof. Hudy is going to drop test four. So I said do you think that's really a good idea to do with a learning disabled individual, who already painstakingly started studying for a test to tell them, we're going to drop that test and make you take tests five.
>
> So I said would it be better if she's going to drop one of the test, why don't you drop test five and let her take test three and test four. And they would not agree to that. It would seem to me, if they're working with somebody and you know they have a disability, the last thing you want to do is, if they're studying for a test, to say you can't take that test.
>
> I have decided to drop it and then you take test number five. So at that point I said, okay here's the deal, we got the agreement for test three on Monday, right? Yeah. Okay. We'll take test three on Monday and then we'll take up the issue of test four at a later time.
>
> So and then [Ms. Martocci] said, you know, she's an adult. Yeah. I said you're not making accommodations for her. And she said she's an adult. And then I ended the conversation there, but basically the gist of the conversation was, I told them they were violating the regulations of the ADA by having — not writing accommodations, modifications to policies.
>
> Policies, like you have to pick up the accommodation letter, bring it to your teacher. By having that protocol, violates it because, according to the law, they have to provide modifications of their policies and protocols, unique to that person's individual disability.

*Id.* pp. 127-28.

Plaintiff took the Principles of Marketing test #3 on April 14, 2014. Plaintiff asserts in

her Additional Material Facts that "Prof. Hudy never graded the test, per 'College Grade

Record.'" Pl. Add. SOMF ¶ 119.

Plaintiff was scheduled to take test #5 at the CAAT at 12:00 noon on April 17, 2014. However, Plaintiff's father called the CAAT at 11:20 A.M. on April 17 insisting that the CAAT administer both test #4 and test #5 to Plaintiff at noon. Pl. Ex. O.  Plaintiff's father was told that the CAAT did not have test #4 and that it would administer test #5 at noon.  *Id.*  The CAAT representative attempted to explain that it was agreed that Plaintiff would take test #5 that day. *Id.*  Plaintiff's father responded: "Michaela did not agree to that, it was all that teacher's doing." *Id.*  The CAAT representative told Plaintiff's father that it was "out of [her] hands" and that she would transfer him to the marketing department so we could discuss this with that department and with Prof. Meehan. *Id.*  Although Plaintiff's father was transferred to the operator and instructed to ask for the marketing department, Plaintiff did not arrive to take test  #5.  *Id.*  When Prof. Meehan learned of these developments by email from the CAAT representative, she responded that it was her understanding that arrangements to skip test #4 were made between Plaintiff's father and Ms. Martocci on April 11, which Prof. Meehan approved when she was contacted by Ms. Martocci.  *Id.*  Prof. Meehan further indicated that she was contacted by Ms. Martocci on April 15 and advised that Plaintiff had lost her syllabus and was questioning what chapters to study for test #5. *Id.*  Prof. Meehan also indicated that Ms. Martocci told Plaintiff to approach Prof. Meehan to get a new syllabus, but Plaintiff did not do so. *Id.*  Plaintiff never took Principles of Marketing test  #4 or #5.

During the spring semester 2014, Plaintiff frequently would stand outside Prof. Meehan's office and classroom. Def. Ex. 1, p. 60.  Plaintiff disputes whether this was a regular occurrence, but Plaintiff testified that "most of the days" between March 19 and April

17

11 she stood outside of Prof. Meehan's classroom. *Id.; see also* Def. Ex. 3, p. 32 (Plaintiff testified that she went to Prof. Meehan's office often but would not go in and would only stand outside the office.). When Prof. Meehan spoke to Plaintiff during these times, Plaintiff would not respond. Plaintiff asserts that she would not say anything because, although she was trying to talk to Prof. Meehan, Prof. Meehan "wouldn't let me. I couldn't because I'm too shy." Def. Ex. 3, p. 32; *see also* Def. Ex. 1, p. 60.

Also in the spring semester 2014, Plaintiff would follow Professor Meehan down the hallways at HVCC, but not say anything. Plaintiff testified that there was a point in time during the spring semester that she followed Prof. Meehan every day but did not talk to her because Plaintiff "felt invisible." Def. Ex. 3, pp. 45-50. On a number of occasions while following Prof. Meehan, Plaintiff would hide if Prof. Meehan turned around. Plaintiff never told Prof. Meehan why she was following her and hiding.

This non-communicative, non-responsive behavior came to the attention of the SBAT. Ms. Martocci advised the SBAT that, based upon her review of Plaintiff's high school Psychological Report, Plaintiff's behavior was probably the result of her communication difficulties. Pl. Ex. II, pp. 80-82.

Plaintiff called Professor Meehan several times in the spring 2014 semester and would not speak when the call was received. Def. Ex. 2, pp. 57, 65–66, 76. Prof. Meehan would say "hello, hello," and ask who was on the other end, but received no response. On at least one occasion, Plaintiff remained on the phone for more than 30 seconds without speaking.

On April 24, 2014, Plaintiff was in the hallway outside of Prof. Meehan's office. When Prof. Meehan asked Plaintiff if she needed something, Plaintiff did not respond. Prof.

18

Meehan called HVCC Public Safety and told them that Plaintiff was in the hallway outside of her office, would not speak her, and had been following her.  HVCC Public Safety Officer Steven Denio responded to the scene, spoke with Plaintiff, informed Plaintiff that she could not "hang out in the Fitz 211 area," could not continue to follow Prof. Meehan, and cautioned her that if she continued to follow Prof. Meehan she would face disciplinary action.  Def. Ex. 22 (April 24 Incident Report ).[10]  Prof. Meehan did not voice an objection when Off. Denio told Plaintiff that if she needed to speak with Prof. Meehan she should go to her office, knock on her door, and speak with her there.  Pl. Ex. EE, pp.. 238-29.   When asked why she did not voice an objection to this advice, Prof. Meehan explained: "I never said I wanted her to leave me alone, I wanted to have her stop the behavior that she was exhibiting, this stalker behavior in the hallway, following me. That is much different than knocking on the door to have a discussion about your course."  *Id.* p. 239.

Prof. Meehan asked Public Safety to escort her to her class during the spring 2014 semester because she was concerned about Plaintiff's behaviors.  Def. SOMF ¶ 55.[11] HVCC Public Safety Director Fred Aliberti sent the April 24 incident report to Dr. Popovics because he believed the incident violated HVCC's student code of conduct.

---

[10]Plaintiff denies this fact because she does not remember the interaction with Public Safety Officer Denio. Pl. Resp. SOMF, ¶ 54.  This denial is substantively insufficient.

[11]Plaintiff denied this fact because Prof. Meehan "did not testify that she was concerned about plaintiff's behaviors, but that she 'was shaken' and 'did not feel safe' by the way she was being followed by plaintiff." Pl. Resp. SOMF, ¶ 55. This denial is substantively insufficient.  Plaintiff also notes in her Statement of  Additional Material Facts that Prof. Meehan testified that Plaintiff never verbally threatened her, that she knew that Plaintiff "was a very shy girl and had some social disabilities," that she thought that Plaintiff had Asperger's Syndrome, that Plaintiff would stay behind after to the rest of the class left if she needed to talk to Prof. Meehan, and that Prof. Meehan had no reason to believe that plaintiff had ever been violent or had physically hurt anyone. Pl. Add. SOMF, ¶ 127. These additional facts do not negate Defendants' asserted fact that Prof. Meehan asked Public Safety to escort her to her class during the spring 2014 semester because she was concerned about Plaintiff's behaviors.

Plaintiff stopped attending Principles of Marketing class in mid-April 2014. Plaintiff notes that she was warned to stop "stalking" Prof. Meehan on April 24, 2014, and she also testified that she stopped going because Prof. Meehan would not help her with the class. Plaintiff admits that she never informed anyone at HVCC that she felt Prof. Meehan was not helping her in the spring semester.

On April 28, 2014, Prof. Meehan called HVCC Public Safety and told them that Plaintiff again was in a room across from her office and would not leave. Def. SOMF ¶ 57.[12] Prof. Meehan indicated that Plaintiff was "in the classroom, across from my advisement office in Brahan, and was hiding in the classroom. . . . She was in the classroom, peering around the corner, to view me in my office." Pl. Ex. EE, p. 40. She could not recall if she made any attempt to initiate any communication with Plaintiff that day and did not know whether it was a violation of any policy for a student to stand in a classroom. Pl. Add. SOMF ¶ 183. Public Safety officials responded to the scene, and Public Safety Off. Amanda Miller-Kalbfiesh told Plaintiff that she needed to leave the area and could not remain in a room near Prof. Meehan's office. Def. SOMF, ¶ 58.[13]

Plaintiff did not tell her parents about the April 24 or April 28 incidents.

After receiving the April 28 incident report, Dr. Popovics, whose duties included being responsible for student discipline, Pl. Ex. FF, pp. 4, 56, wrote a Notice of Charges under the

---

[12]Plaintiff denied this fact because "[t]he testimony of Off. Miller-Kalbfiesh indicates that [Prof. Meehan] screamed something to the effect of, 'She's across the hall from me, get her out of here, I thought we had this taken care of.'" Pl. Resp. SOMF ¶ 57. This denial is substantively insufficient.

[13]Plaintiff denied this fact because "an April 28, 2014 HVCC Public Safety incident report, states that Off. Amanda Miller-Kalbfiesh 'informed [Plaintiff] that due to this past Thursday's events that staying in the room was not an option.'" In addition, Plaintiff points out that she testified that she did not remember Off. Miller-Kalbfiesh's saying that, and that she did not remember being told that she "shouldn't be hanging around Professor Hudy as of April 28th, 2014." Pl. Resp. SOMF ¶ 58. This denial is substantively insufficient.

HVCC Student Code of Conduct and had it delivered to Plaintiff. *Id.* p. 118. The Notice of

Charges related to incident reports concerning Plaintiff's conduct on March 13, April 24, and

April 28, and alleged that Plaintiff harassed a member of the faculty and refused to follow

the directives of college personnel. Pl. Ex. Q; *see* Def. SOMF ¶ 61.

On April 29, Dr. Popovics organized a meeting with Plaintiff to discuss these charges,

and report Prof. Meehan's concerns about Plaintiff's ongoing behaviors and her need to

moderate those behaviors. Def. SOMF. *Id.* ¶ 62. Also present at the meeting were HVCC

Public Safety Director Fred Aliberti, Director of Disability Services Deanne Martocci, Director

of the Center for Counseling and Transfer Dr. Kathleen Sweener, and Technical Assistant

Elaine Maloney. Dr. Popovics explained that the individuals present wanted to help

Plaintiff. Pl. Ex. Q. Dr. Popovics "expressed concern about the behavior that [Plaintiff] had

been exhibiting toward Prof. Wendy Hudy and ask [Plaintiff] to comment on this behavior.

[Plaintiff] did not respond to the question and kept her head down." *Id.* Ms. Martocci

"shared that Prof. Hudy was uncomfortable when [Plaintiff] followed her and explained that it

would be fine if [Plaintiff] set up an appointment to speak to her professor instead of

following her around and sitting outside of her office." *Id.* Dr. Sweener asked Plaintiff

whether she had any thoughts of hurting herself or others, to which Plaintiff responded "No."

*Id.* "Mr. Aliberti explained the term 'stalking,' and directed [Plaintiff] to stop her behavior.

He shared that the next action would be an arrest." *Id.; see also* Def. Ex. 1, pp. 55-57, 62-

63.[14] Plaintiff was also given a Warning Letter at this meeting. The Warning Letter reads:

---

[14]Plaintiff testified that, at the meeting, it was explained with stalking was. Def. Ex. 1, p. 57. Plaintiff acknowledged that at this meeting where "the subject of stalking came up," she was told that she needed to "stay away from Prof. Hudy" and that if she "didn't stay away from Prof. Hardy that there could be problems, maybe even an arrest." *Id.* p. 62-63. Drawing reasonable inferences in Plaintiff's favor, and because the

(continued...)

"Continued stalking of Professor Hudy will result in appropriate sanctions which may include criminal charges. It is recommended that you utilize appropriate support services including the Center for Access and Assistive Technology, Center for Counseling and Transfer and the Learning Disabilities Specialist." Pl. Add. SOMF, ¶ 130; *see* Def. Ex. 25.

Also on April 29, Plaintiff discussed the Warning Letter with Ms. Martocci.  Ms. Martocci explained to Plaintiff that she could still go to Prof. Meehan class, could still go to Prof. Meehan's office, could still ask "legitimate questions about work", and could still email Prof. Meehan. Pl. Ex. II, pp. 161-162, 230.  In a separate meeting, Plaintiff met with Ms. Martocci and Prof. Meehan to further discuss Prof. Meehan's concerns.  Prior to this meeting, Prof. Meehan requested that a Public Safety officer be stationed outside of the room where they met.

Plaintiff did not give the Warning Letter to her mother or father, and did not tell them about the meeting until after her arrest on May 6.

On Wednesday, April 30, 2014, Prof. Meehan e-mailed test #6 to the entire class, including Plaintiff.  Pl. Ex. SS.  This email indicated that test #6 "is a take-home test that will be collected on Monday."  *Id.*

Plaintiff e-mailed Professor Meehan on Thursday, May 1, 2014, at 9:34 AM stating: "I want to speak to you about something I am going to do today. I would like to know if you are available to speak to me on Monday at 4:00." Def. Ex. 28.  Prof. Meehan forwarded this e-mail to Public Safety and Ms. Martocci.  She responded to Plaintiff by stating: "As

---

[14](...continued)
warning letter issued during this meeting discusses only stalking and because Ms. Martocci explained to Plaintiff prohibited conduct in the context of stalking behavior, the Court construes the verbal warning to have related only to stalking conduct and not all contact.

discussed on Tuesday, in the meeting with Deanne and I, there are counselors available to you at HVCC to discuss anything that you may have on your mind. I am not available to meet with you. Please do not e-mail me as I need to devote my time to the students in my courses." *Id.* Plaintiff contends that, at the time, she was still a student in Prof. Meehan's class and Prof. Meehan was still her academic advisor. Pl. Add. SOMF, ¶¶ 131-32. Plaintiff responded back to Prof. Meehan indicating:

> It's about something else. I talked two [*sic*] English teachers about possibly doing a minor in English someplace and they said to speak to an advisor. I was wondering if you could help me out and find some colleges where I could minor in English. Because I don't know any colleges where I could minor in English. Also I got your emails you sent yesterday with the test I looked up my schedule and says that I am still in the class. I was wondering if you want me to do the test or if you know of a way that I can still drop out.

*Id.*

Plaintiff points out that Ms. Martocci had previously advised her that these communications were permitted. Pl. Ex. II, p. 161-62.[15] Prof. Meehan forwarded this email to HVCC Public Safety and Ms. Martocci, and responded to Plaintiff:

> At this point in Principles of Marketing you will be receiving an "F" because you did not comply with the plan set forth for taking the test as arranged between you and the CAAT.
>
> If you need assistance in making decisions as it relates to pursuing a major in English, you can talk to an Admissions Counselor in the Admissions Office located in Gunther Hall or a Counselor in the Center for Transfer located in the Seik Campus Center.

*Id.*

---

[15] When asked at her deposition how she explained to Plaintiff how Plaintiff could lawfully be around Prof. Meehan, Ms. Martocci stated: "I talked to her about, you know, if you're going to class, office hours, legitimate questions about work that you're doing, you're turning in for her, those are all — that's fine, no problem with that, emails about her course work that's fine. It's the other things, hanging outside the office, following her, you know, no phone calls to her, all that stuff is off the table." Pl. Ex. II, pp. 161-62.

Plaintiff replied by indicating: "Okay well I think I'm just going to stop eating because I am not happy. I feel like nobody likes me." *Id.* Prof. Meehan also forwarded this email to HVCC Public Safety and Ms. Martocci.

Regarding Prof. Meehan's statement that Plaintiff would be receiving an "F" in the course, Plaintiff notes that the Principles of Marketing syllabus states that tests comprised 50% of the final grade, the final exam (Test 6) comprised 25% of the final grade, assignments, homework and projects comprised 25% of the final grade, and that 60 is a passing grade. Pl. Ex. F. Plaintiff contends that, at the time, she could "still have received a passing "D" grade based on having Test 3 graded, dropping the grade for Test 4 (as previously cited), getting a "zero" for Test 5, having the hand-in Final Exam (Test 6) graded at 25% of her grade, and receiving credit for assignments, homework and projects." Pl. Add. SOMF, ¶ 133. Plaintiff also notes that in an email dated April 7, 2014 from Prof. Meehan to Ms. Dowd (and copied to Plaintiff) regarding Plaintiff taking tests at the CAAT, Prof. Meehan indicated, *inter alia:* "Assignments/tests will need to be completed according to regular class deadlines. Any assignments/tests not taken will result in a grade of 0%. No assignments will be accepted after the last day of instruction for the spring semester, Thursday, May 8th." Def. Ex. 18. Plaintiff contends that on May 6, at the time Plaintiff was arrested (discussed below), Plaintiff was attempting to turn in her last test for the course and that she was doing it in accordance with Prof. Meehan's email indicating that all tests had to be turned in by May 8.

On May 2, 2014, Plaintiff sent a Facebook message to HVCC, asking, *inter alia*, "I want to know something about stalking dose [*sic*] it involve touching someone." Def. Ex. 29.

HVCC Public Safety was informed about the Facebook message.

On May 3, 2014, Plaintiff e-mailed Prof. Meehan again, this time indicating:

I have three questions. My first question is I am trying to write down my strengths and weaknesses for if a job that I apply to asks me for them but I am stuck and I was wondering if you knew any of my strengths and weaknesses. My second question is am I allowed to take some English courses someplace else or do I have to take English courses even if I want to take them someplace else. My third question is do you have any of my tests and if you do can I have them or do you have to hang onto them. When you get this message please email me back ASAP.

Def. Ex. 30.

Professor Meehan forwarded this e-mail to HVCC Public Safety and Ms. Martocci.

Also on May 3, 2014, Plaintiff impersonated her mother by sending an e-mail to Prof.

Meehan from the email address "kathya.bied97@gmail.com," which did not belong to

Plaintiff's mother. The e-mail sent to Prof. Meehan from this account stated:

Hi Wendy Hudy, I decided to log into Michaela's account to find your email address. I read the email about you giving her an "F" and I want to know how she can improve that grade. She also told me something today about why she never got her accommodation letters to begin with and I think you should find out from her. When you get this message can you please email me and either email her of [sic] talk to her sometime during the day on Monday. Thanks, Kathy Bied.

Def. Ex. 31.

Prof. Meehan forwarded this e-mail to HVCC Public Safety and Ms. Martocci.

On May 4, Plaintiff placed a call to Prof. Meehan from her brother's cell phone. Def.

Ex. 4, p. 49. Plaintiff testified that she was trying to get her brother to talk to Prof. Meehan,

*id.*, but apparently no one spoke to Prof. Meehan and Plaintiff then hung up. The call lasted

one minute. Pl. Ex. M. Plaintiff called Prof. Meehan from her brother's cell phone because

she thought Prof. Meehan might not answer a call from Plaintiff's phone. Def. Ex. 2, p. 77.

Prof. Meehan notified HVCC Public Safety and Ms. Martocci of the phone call.

HVCC Public Safety Director Aliberti reviewed the incident reports involving Plaintiff, spoke with and exchanged e-mails with Prof. Meehan, and reviewed Prof. Meehan's statement.  Pl. Ex. BB, pp. 126-128, 169-172, 187-198, 247-258.  Based on this investigation, Plaintiff's continuing behavior, and her failure to follow the April 29 warnings, together with Professor Meehan's expressed concern for her safety, Director Aliberti made the decision that an arrest of Plaintiff was appropriate for Stalking in the Fourth Degree in violation of New York Penal Law §120.45 (2), and for Aggravated Harassment in the Second Degree in violation of New York Penal Law 240.30 (01).  *Id.* pp. 235-258.   Director Aliberti talked with Off. Miller-Kalbfiesh about this decision.  *Id.* pp. 240-41.  Off. Miller-Kalbfiesh was already familiar with the situation because of her involvement in the matter on April 28, which caused her to review the incident report from April 24, and because Director Aliberti had been forwarding her the emails received from Prof. Meehan. Pl. Ex. GG, pp. 59, 66.  Director Aliberti indicated that he did not want Plaintiff arrested immediately, as he thought it was appropriate to hold off to determine whether Plaintiff continued with her activities directed at Prof. Meehan, Pl. Ex. BB, pp. 240-41, but he directed Off. Miller-Kalbfiesh to draw up charging documents in case an arrest was needed. Pl. Ex. GG, p. 66.

On May 3, 2014 at 9:00 p.m., Director Aliberti emailed Prof. Meehan and told her that he was going to send Off. Denio to her office in the morning to make sure Plaintiff was not around, and that Off. Denio would provide her with a statement form, and told her that he would like her to "summarize what has occurred in the past few weeks and also mention the continuing emails."  Pl. Ex. EE, p. 60.  This email also indicated: "This will help us when we

arrest Michaela for harassment, probably sometime this week, especially if those emails

continue." *Id.* When asked whether she read the email as suggesting things that should be

put in her statement, Prof. Meehan testified that she wrote her statement "as factual, and

not upon the suggestions of anyone. . . . I did not believe he was suggesting me to put in

anything that didn't happen that he did not know of already. He wanted to make sure that I

included all the facts." *Id.*, 60-61.

On May 4, 2014, Prof. Meehan received a communication from HVCC Public Safety

indicating that Plaintiff might be arrested for her conduct if Plaintiff's conduct continued. Pl.

Ex. UU, p. 109-10, 133-15.   In the days before Plaintiff was arrested, Prof. Meehan told Ms.

Martocci that Plaintiff's behaviors had been a cry for help, and "she just didn't know how to

ask me." Pl. Ex. EE, pp. 250, 255-256.  Moreover, Prof. Meehan testified that she "never

told anybody that I wanted her arrested." *Id.* p. 51.

On May 6, 2014, at 9:40 A.M., Professor Meehan completed and signed an HVCC

Department of Public Safety Supporting Statement detailing Plaintiff's actions and their

impact on her.  Def. Ex.  8, pp. 54–56; Def. Ex. 32.  The handwritten portion of this

statement,[16] which was verified, indicates, *inter alia*,

> [Plaintiff's] behavior is adversely affecting me in the workplace. I am on high alert
> walking in the core doors, my head on a swivel watching, waiting for her to become
> visible from behind objects, doors and corners. I dread coming to campus, a feeling I
> have never felt in my seven years of service. When I encounter her, received a
> phone call or a cryptic email requesting a meeting, I begin to shake, break out into a
> cold sweat and feel nauseous. Her behavior is threatening to me and has caused me
> to change my daily activities as well as taking my attention away from my other
> students. Her behavior is interfering with my performance on the job.

Def. Ex. 32, pp. 4-5.  The typed portion of this statement recounts Prof. Meehan's

---

[16] (the first potion is handwritten, and the second portion is a type-written attachment)

interactions with Plaintiff, and includes statements indicating: (a) "After instructing [Plaintiff] to stop emailing me, she continued to email me," and (b) that on May 4, Prof. Meehan received a telephone call from Plaintiff's brother's telephone number, no one spoke when Prof. Meehan answered the call, and that Prof. Meehan believed the telephone call was from Plaintiff and was in violation of "the warnings and parameters of acceptable behavior set forth by the college." *Id.*, pp. 9-10. Off. Miller-Kalbfiesh reviewed the statements before arresting Plaintiff. Pl. Ex. GG, p. 87.

On the evening of May 6, 2014, Plaintiff was outside Prof. Meehan's office in Brahan Hall. Def. SOMF ¶ 90.[17]  Plaintiff contends she was trying to turn in test # 6 at Brahan Hall, had discovered that Prof. Meehan was not in her office, and was headed to Fitzgibbons Hall, where she thought Prof. Meehan might be. Pl. Ex. DD, pp. 58-59, 63. Off. Miller-Kalbfiesh was on patrol in Brahan Hall when she saw Plaintiff.   Off. Miller-Kalbfiesh's Arrest Report indicates that she recognized Plaintiff as a "suspect in an open investigation with signed complaints held by the DPS," and that when Plaintiff recognized the officer, Plaintiff "ducked down the hallway heading east." Def. Ex. 45. Off. Miller-Kalbfiesh testified that Plaintiff ran "as much as [Plaintiff] could", meaning that she "took off at a quick pace down the hallway." Def. Ex. 11, pp. 112-113. Off. Miller-Kalbfiesh caught up to Plaintiff, calling out her name and telling her to stop. Def. Ex. 45. Off. Miller-Kalbfiesh told Plaintiff that she was not supposed to be in the area in Brahan Hall where she was spotted, that Plaintiff was going to be arrested due to ongoing incidents on campus, and that she needed

---

[17]Plaintiff denies this factual assertion by claiming: "Evening by definition begins at 6:00 p.m. and ends at dusk when no sunlight is visible. According to Off. Miller-Kalbfiesh's arrest report, she encountered plaintiff on the second floor of Brahan Hall at 5:16 p.m. on May 6, 2014." Pl. Resp. SOMF, ¶ 90.  This denial is substantively insufficient.

to come with Off. Miller-Kalbfiesh to the Public Safety Office.  Pl. Ex. GG, p. 114;  Def. Ex.
45.   Plaintiff did not say anything in response.   Pl. Ex. GG, p. 114.  Off. Miller-Kalbfiesh
told Plaintiff that they could walk back to the office together or, if she refused, that she
would be forced to walk back to the office in handcuffs.  Def. Ex. 45.  Apparently seeing
Plaintiff make no attempt to comply, Off. Miller-Kalbfiesh instructed Plaintiff to put down her
belongings and put her hands behind her back.  *Id.*  At this point Plaintiff froze up, put her
head down, pulled her hands to her chest, and refused to move. *Id.; see also*  Pl. Ex. GG, p.
116.   After five or 10 minutes of unsuccessfully trying to persuade Plaintiff to walk with her,
Off. Miller-Kalbfiesh called for backup.  Public Safety Off. Jason Vandenberg arrived on the
scene.  Pl. Ex. GG, pp. 117-119.  Plaintiff refused to willfully move from the scene, so the
officers determined to obtain a "Stryker chair" that was nearby and have Plaintiff sit in the
chair so she can be wheeled from the area.  *Id.* pp.  119- 131. Plaintiff refused to take off her
backpack or get into the chair.  *Id.*  After a half dozen times of asking her to take off her
backpack and get into the chair, the officers cut the straps on Plaintiff's backpack and
physically placed her in the chair.  *Id.*  Plaintiff was not handcuffed but the officers placed
the lap belt on her for her own safety.  *Id.*

Plaintiff was charged with Resisting Arrest, in violation of New York Penal Law §
205.30;[18] Stalking in the Fourth Degree, in violation of New York Penal Law §120.45 (02);[19]

---

[18]The accusatory instrument charging Plaintiff with Resisting Arrest alleges that on May 6, 2014, Plaintiff "attempted to prevent a police officer being that of CPO Miller-Kalbfiesh and Vandenburgh from effecting an authorized arrest of a defendant by refusing to put her hands behind her back when ordered to, by not walking when ordered to, and passively resisting by pulling her hand to her chest and not moving."  Pl. Ex. U.

[19]The accusatory instrument charging Plaintiff with Stalking in the Fourth Degree alleges that, on April 24 and 28, 2014, Plaintiff did intentionally and unlawfully commit the offense of Stalking in the Fourth Degree
(continued...)

and Aggravated Harassment in the Second Degree, in violation of New York Penal Law §
240.30 (01).[20] Def. Ex. 33.

Plaintiff was arraigned in the North Greenbush Town Court and released into the
custody of her parents later that day.  The North Greenbush Town Court issued a temporary
order of protection, ordering Plaintiff to "refrain from communication or any other contact by
mail, telephone, email, voicemail or other electronic or any other means" with Prof. Meehan,
and to further refrain from illegal contact with her. Pl. Ex. X.

Professor Meehan spoke once with a representative from the District Attorney's
office.  Def. Ex. 8, pp. 215-16.  When asked by the District Attorney's representative what
Prof. Meehan thought should happen to Plaintiff, Prof. Meehan indicated that she did not
think that Plaintiff needed a form of public punishment but rather "would like to see the court
mandate that [Plaintiff] see a therapist or counselor to help her and what she was dealing
with and [Prof. Meehan hoped] that that would be imposed and that there would be a
mandate just to help [Plaintiff] as a person." *Id.* p. 215.

The only record citation concerning the disposition of the criminal case against
Plaintiff is to Plaintiff's Amended Response to Defendants' Second Set of Interrogatories,
Def. Ex. 36, p. 6 (Interrogatory No. 11), where it is alleged: "All criminal charges brought

---

[19](...continued)
in that she "did place Wendy Hudy in fear of material harm to her mental or emotional health by following
Wendy around campus and occupying an empty classroom across from where Wendy was working after
committing the same conduct on April 24, 2014 and being instructed by Hudson Valley Community College
Department of Public Safety personnel to cease following Wendy Hudy about campus and emailing Wendy
Hudy after being told by Wendy Hudy to cease emailing her." Pl. Ex. W.

[20]The accusatory instrument charging Plaintiff with Aggravated Harassment in the Second Degree
charges that, on May 4, 2014 at about 4:41 p.m., with the intent to harass, annoy, threaten or alarm another
person, Plaintiff "did call Wendy Hudy from her brother's cell phone after repeatedly being told by [HVCC]
school officials to cease and desist all contact with Wendy Hudy." Pl. Ex. V.

against Plaintiff in the Town of North Greenbush Town Court were dismissed by Hon. Stephanie Piel. The decisions and orders from the North Greenbush Town Court have been previously turned over, and they speak for themselves."

## IV.    DISCUSSION

### a.    ADA & Rehabilitation Act

#### 1.    Plaintiff's Disability Discrimination Claims

Plaintiff alleges in the First and Second Causes of Action claims under he ADA and the Rehabilitation Act. The Court interprets Plaintiff's allegations as asserting three distinct claims under these Acts: (1) That Defendants violated Plaintiff's rights under these Acts by not initially sending the Principles of Marketing test to the CAAT, thereby depriving her of a reasonable accommodation; (2) That Defendants violated Plaintiff's rights under these Acts by failing to give Plaintiff reasonable extensions on taking the test she missed in Principles of Marketing, thereby depriving her of a reasonable accommodation; and (3) That Defendants violated Plaintiff's rights under these Acts by failing to appropriately consider Plaintiff's disability before arresting her, thereby depriving her of a reasonable accommodation. *See* Am. Compl. ¶¶ 21-105.

#### 2.    ADA & Rehabilitation Act Claims against Individual Defendants

"[A]n individual is ... not an 'employer' under the ADA and, therefore, may not be liable for disability discrimination." *Ivanov v. N.Y.C. Transit Authority*, 13 Civ. 4280, 2014 WL 2600230, at *5 (S.D.N.Y. June 5, 2014); *see Garcia v. Kings Cty. Hosp. Ctr.*, No. 16 CIV. 3151 (ER), 2018 WL 389212, at *3 (S.D.N.Y. Jan. 11, 2018)("At the outset, Defendants argue that Plaintiff's ADA claims against Walters must be dismissed because there is no

individual liability under the ADA. Defendants are correct."); *Nelson v. City of New York*, 11 Civ. 2732, 2013 WL 4437224, at *14 (S.D.N.Y. Aug. 19, 2013) ("It is well established that there is no individual liability under the ADA...."). Likewise, Section 504 claims against individuals in their personal capacities are barred. *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).

Thus, to the extent Plaintiff alleges ADA or Rehabilitation Act discrimination claims against Wendy A. Meehan f/k/a Wendy A. Hudy, Alexander J. Popovics, and Amanda J. Miller-Kalbfiesh in their individual capacities, those claims are dismissed.

### 3. Proving ADA & Rehabilitation Act Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for ... participation in programs or activities provided by a public entity." 42 U.S.C.  § 12131(2).  A public entity includes a state or local government body or any instrumentality thereof. *Id*. § 12131(1).  Section 504 of the Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794(a).

"Both acts 'prohibit discrimination against qualified disabled individuals by requiring

that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in ... public accommodations.'" *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186 (2d Cir. 2015)(quoting *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir.), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004)).  The ADA defines "discriminate" as, *inter alia*, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless [the provider of the service] can demonstrate that the accommodation would impose an undue hardship on" its operations. 42 U.S.C. § 12112(b)(5)(A).  Under the Rehabilitation Act "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers.... [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301, 105 S. Ct. 712, 83 L.Ed.2d 661 (1985).

To establish a prima facie violation under Title II of the ADA or the Rehabilitation Act, Plaintiff must demonstrate that: (1) she is a "'qualified individual' with a disability;" (2) defendants are subject to one of the Acts; and (3) "she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability." *Powell*, 364 F.3d at 85. "Because the standards adopted by the two statutes are nearly identical, we consider the merits of these claims together."  *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)(citation omitted).

"Under both statutes, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual 'to have access to and take

33

a meaningful part in public services.'" *McElwee*, 700 F.3d at 640–41 (quoting *Powell*, 364 F.3d at 85, and citing 42 U.S.C. § 12112(b)(5)(A) (the term "discriminate" under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee"). "'A reasonable accommodation is one that gives the otherwise qualified plaintiff with disabilities meaningful access to the program or services sought.'" *Id.* (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003)).

"In the education context, the ADA and the Rehabilitation Act require a covered institution to offer reasonable accommodations for a student's known disability unless the accommodation would impose an undue hardship on the operation of its program, or fundamentally alter the nature of the service, program, or activity." *Dean*, 804 F.3d at 186-87 (interior quotation marks and citations omitted). "Thus, while a covered entity must make reasonable accommodations, it does not have to provide a disabled individual with every accommodation [s]he requests or the accommodation of [her] choice." *Id.,* at 187 (interior quotation marks and citations omitted). "[A] plaintiff alleging a failure to accommodate a disability bears the burdens of both production and persuasion as to the existence of some accommodation that would allow the plaintiff to meet the essential requirements of the service, program, or activity at issue." *Id.*, at 190.

> Once the plaintiff has met the light burden of producing evidence as to the facial reasonableness or plausibility of the accommodation, the burden falls to the defendant educational-institution to persuade the fact-finder that the proposed accommodation is unreasonable. That burden may be met by establishing that the requested accommodation would (a) impose undue hardship on the operation of the defendant's service, program, or activity, or (b) require a fundamental or substantial modification to the nature of its academic program or standards.

*Id.*

In order to obtain money damages under the ADA, as Plaintiff seeks here, Plaintiff must show that the violation was "motivated by either discriminatory animus or ill will stemming from plaintiff's disability." *Powell*, 364 F.3d at 89.  It is well recognized that "direct proof of this will often be lacking: smoking guns are rarely left in plain view. To establish discriminatory animus, therefore, a plaintiff may rely on a burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973) or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252-258 (1989)." *Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98, 112 (2d Cir. 2001).   Under the Rehabilitation Act, Plaintiff must demonstrate that the alleged violation "resulted from 'deliberate indifference' to the rights [of] the disabled."  *Powell*, 364 F.3d at 89; *Garcia*, 280 F.3d at  115.

### 4.  Analysis of Plaintiff's ADA & Rehabilitation Act Claims

Defendants do not challenge that Plaintiff is a qualified individual with a disability within the meaning of the ADA and Rehabilitation Act, or that HVCC is subject to both Acts. Rather, the dispute in this case concerns the third prong of the prima facie case, that is, whether Plaintiff was denied the opportunity to participate in or benefit from HVCC's services, programs, or activities, or was otherwise discriminated against by HVCC by reason of her disability.

### A.  Failure to Initially Send Test to the CAAT Spring 2014

Plaintiff alleges that her rights under the ADA and the Rehabilitation Act were violated because her tests were not sent to the CAAT in the beginning of the spring 2014

semester, and that she was denied the reasonable accommodation of HVCC officials independently determining whether Plaintiff had an accommodation that allowed her to take her tests at the CAAT.

While it appears that, although the tests were not initially sent by Prof. Meehan to the CAAT in the spring 2014 semester, it also appears that this was due to Plaintiff's omission. Plaintiff was advised, in response to a question she presented to a CAAT representative, that she needed to pick up her accommodation letters each semester. This advice was apparently based upon a requirement at HVCC that students with disability accommodations need to personally deliver their accommodation letters to each professor each semester. Further, the undisputed evidence indicates that Prof. Meehan asked Plaintiff repeatedly to turn in her accommodation letter so Prof. Meehan could send the tests to the CAAT. Still further, the evidence indicates that (a) Plaintiff complied, in her first semester, with HVCC's policy that required disabled students to deliver accommodation letters to each of the professors, (b) Plaintiff did so in a course taught by Prof. Meehan, and (c) until Dr. Bied spoke with Ms. Martocci on April 11, which was after the tests were being sent to the CAAT, neither Plaintiff nor her family members made any request that HVCC provide an accommodation ignoring the policy requiring disabled students to deliver accommodation letters to their professors.

Plaintiff seems to argue that the evidence was such that HVCC officials should have independently determined whether Plaintiff desired to take her tests at the CAAT even though she did not turn in her accommodation letters. In this regard, Plaintiff points to evidence from the Psychological Report indicating that Plaintiff had difficulties socially interacting, communicating with others, and self advocating. Plaintiff also points to

36

evidence indicating that as early as the first test in Prof. Meehan's class, Prof. Meehan began asking Plaintiff to turn in her accommodation letter if she wanted her tests sent to the CAAT as in the fall 2013 semester.  Further, Plaintiff points out that HVCC's policy of requiring students to deliver accommodation letters to their professors was not followed for Plaintiff in the fall 2014 semester because her tests were eventually sent to the CAAT without Plaintiff turning in an accommodation letter.  Plaintiff argues that the record is devoid of any evidence that HVCC "diligently assessed" whether the accommodation that it "denied and frustrated" (presumably Plaintiff's accommodation of taking her tests at the CAAT) could have been afforded "without imposing undue financial and administrative burdens" on HVCC or would have required a "fundamental alteration to the academic caliber of its offerings," as explained in *Dean*, 804 F.3d at 191.

When the evidence presented on summary judgment is reviewed a light most favorable to Plaintiff, a reasonable factfinder could conclude that HVCC personnel were put on notice that Plaintiff was electing to exercise her accommodations in Prof. Meehan's class when Plaintiff showed up for the first test but it had not been sent by her professor.   A reasonable factfinder could also conclude that HVCC should have, but did not, diligently assess whether, in light of Plaintiff's documented difficulties in communication and self advocacy, it should have overridden the policy that students present accommodation letters before they receive their accommodations.  In this regard, a reasonable factfinder could conclude that HVCC failed to properly assess whether its policies allowed Plaintiff to access her disability accommodations.

Be that at is may, however, there is insufficient evidence for a reasonable fact finder to conclude that Prof. Meehan, or any other individual at HVCC, was motivated by

discriminatory animus or ill will stemming from Plaintiff's disability in allowing the delay in the tests being sent to the CAAT, or was deliberately indifferent to Plaintiff's rights under the Rehabilitation Act.   As indicated, Prof. Meehan asked Plaintiff repeatedly to turn in her accommodation form, and caused an Early Alert e-mail and notification to be sent to Plaintiff on February 21, 2014, alerting Plaintiff to concerns about her "academic progress this semester." Plaintiff and her mother met with Prof. Meehan on March 17, 2014 during which Prof. Meehan advised that Plaintiff had not taken any of the tests in any of her classes, and that if she wanted to take the missed tests at the CAAT, Plaintiff would have to pick up her accommodation letter.  Staff at the CAAT eventually contacted Prof. Meehan advising her that Plaintiff had accommodation letters for the semester and was electing to take her tests at the CAAT, which prompted Prof. Meehan to send the tests to the CAAT. And Prof. Meehan extended Plaintiff several extension to take the missed tests.

Where a defendant "worked with Plaintiff" and made "reasonable efforts to accommodate," as a matter of law there is insufficient evidence to conclude that the defendant intentionally discriminated or acted with deliberate indifference. *O'Connor*, 2005 U.S. Dist. LEXIS 26205, at *16–17; *see Powell*, 364 F.3d at 87 (granting summary judgment where there was "no proof [plaintiff] was discriminated against under the Acts on account of her alleged disability . . . [o]n the contrary, nothing suggests that [defendant college] did anything other than support [plaintiff] in her efforts to succeed"); *Melendez*, 2005 U.S. Dist. LEXIS 31384, *30-31 (dismissing claim where defendants made efforts to accommodate plaintiff, and there was "no evidence of intentional discrimination").  Here, HVCC personnel's demonstrated efforts to help Plaintiff exercise her accommodations, including Prof. Meehan's repeated reminders for Plaintiff to pick up and deliver her accommodation

letter, Prof. Meehan's actions of causing an early alert notification be sent to Plaintiff telling

her that she was falling behind, Prof. Meehan's meeting with Plaintiff and her mother where

it was discussed that Plaintiff had not taken any tests in any course that semester and that

Plaintiff needed to pick up and deliver her accommodation letter, Ms. Martocci's intervention

after learning that Plaintiff had fallen behind in taking her tests and relaying messages from

Plaintiff and her father to Prof. Meehan seeking extensions, and a CAAT representative

emailing Prof. Meehan to advise that although Plaintiff had not picked up her

accommodation letters she was intending to use her accommodation for testing at the

CAAT.  Plaintiff's "feelings and perceptions of being discriminated against [on the basis of

her disability] are not evidence of discrimination." *Bickerstaff v. Vassar College*, 196 F.3d

435, 456 (2d Cir. 1999); *see id.* at 448.[21]  Examining the facts in their totality, no reasonable

factfinder could conclude that Prof. Meehan, or anyone else at HVCC, was motivated by

either discriminatory animus or ill will stemming from Plaintiff's disability, or acted with

deliberate indifference to Plaintiff's disability rights, in allowing the delay in the tests to be

sent to the CAAT.  Thus, the ADA and Rehabilitation Act claims on this basis are dismissed.

### B.  Failure to Provide a Reasonable Testing Time Modification

Plaintiff also contends that HVCC denied her the reasonable accommodation of

---

[21] As indicated in *Bickerstaff*, on a motion for summary judgment the Court:

> must also carefully distinguish between evidence that allows for a reasonable inference of
> discrimination and evidence that gives rise to mere speculation and conjecture.   This
> undertaking is not one of guesswork or theorization.   After all, an inference is not a suspicion
> or a guess.   It is a reasoned, logical decision to conclude that a disputed fact exists on the
> basis of another fact that is known to exist. Thus, the question is whether the evidence can
> reasonably and logically give rise to an inference of discrimination under all of the
> circumstances.

*Bickerstaff,* 196 F.3d at 448 (internal quotation marks and citations omitted).

additional testing time to make up the missed tests.  Plaintiff's father's requests of Ms. Martocci and Prof. Meehan of extensions of the testing schedule for Plaintiff for the missed test is easily interpreted as a request for a disability accommodation.  Plaintiff argues that while Prof. Meehan granted extensions, these extensions required Plaintiff to take two-thirds (four of six) of the tests for the class over a short period of time which was unreasonable given Plaintiff's documented disabilities and limitations.

Whether the extensions provided to Plaintiff to take the missed test were reasonable is a question of fact that cannot be answered on this motion.  Indeed, the record indicates that Plaintiff suffered from a learning disability that required the accommodation of double time to take each test.  A reasonable factfinder could conclude that Prof. Meehan's requirement that Plaintiff take multiple tests in a short span was unreasonable, and that HVCC had not met its burden establishing that the requested accommodation would (a) impose undue hardship on the operation of the defendant's service, program, or activity, or (b) require a fundamental or substantial modification to the nature of its academic program or standards.  The Court notes, as did the Second Circuit in *Dean*, that courts ordinarily accord great deference to the professional, academic judgments of educational institutions. *Dean,* 804 F.3d at 191 (citing *Powell*, 364 F.3d at 88 (noting that in evaluating "the substance of a genuinely academic decision, courts should accord the faculty's professional judgment great deference")).  But, like in *Dean*, the record evidence cited by Defendants on this motion does not squarely establish that, in rejecting additional scheduling modifications, Prof. Meehan or anyone at HVCC diligently assessed whether a scheduling alteration would allow Plaintiff the opportunity to continue in and complete Principles of Marketing without imposing undue financial and administrative burdens on HVCC or requiring a fundamental

40

alteration to the academic caliber of its offerings.

The Court next turns to the questions of whether Prof. Meehan's refusal to provide additional time to take the missed tests was motivated by either discriminatory animus or ill will stemming from Plaintiff's disability, or done with deliberate indifference to the rights of the disabled. As indicated, smoking gun evidence of discriminatory motive rarely exists thereby requiring the Court to determine whether evidence exists from which a reasonable factfinder could draw an inference that a discriminatory motive existed.

As the record indicates, Plaintiff had significant difficulties interacting socially and communicating with others, and these difficulties were documented in her high school Psychological Report . Further, by April 11, 2014 when Plaintiff's father spoke with Ms. Martocci and requested additional time for Plaintiff to take the missed tests (and to take test #4 and drop test #5), Plaintiff had been exhibiting socially inappropriate behavior toward Prof. Meehan such as standing outside of her office without speaking. A reasonable factfinder could conclude that Prof. Meehan equated this behavior with Plaintiff's disabilities. Further, a reasonable factfinder could conclude based on (a) Prof. Meehan's subsequent statements that she wanted Plaintiff to stop "stalking" her, (b) Prof. Meehan's Supporting Statement to the Public Safety Department that eventually led to Plaintiff's arrest, (c) Prof. Meehan's statement that she wanted Plaintiff to stop emailing her even though Plaintiff was still enrolled in Prof. Meehan's class Prof. Meehan was Plaintiff's academic advisor; (d) Prof. Meehan's email to Plaintiff telling her that she would receive an "F" in the Principles of Marketing class even though the semester was not over, that Prof. Meehan harbored discriminatory animus or ill will stemming from Plaintiff's disability. When viewing the facts the light most favorable to Plaintiff, the Court concludes that a reasonable factfinder could

41

find that a discriminatory inference existed and motivated Prof. Meehan's decision to deny

further extensions and require Plaintiff drop the grade for test #4.   A reasonable factfinder

could also conclude that under the circumstances involving a student with a learning

disability, slow cognitive processing speed, and a documented accommodation of double

test taking time, officials at HVCC were deliberately indifferent to Plaintiff's disability rights

when the time allotted for Plaintiff to take the missed tests was not further expanded.

For theses reason, Defendants' motion on this claim brought under the ADA and the

Rehabilitation Act against HVCC is denied.

### C.  Plaintiff's Arrest

The Court next turns to Plaintiff's claims that Defendants violated her rights under the

ADA and the Rehabilitation Act by failing to appropriately consider Plaintiff's disability before

arresting her, thereby depriving her of a reasonable accommodation.

The Voorheesville Central School District Confidential Psychological Report indicates

that Plaintiff "has a history of pragmatic communication and social skill weaknesses which

have impacted her socially," but it does not indicate, as Plaintiff asserts, that she had been

diagnosed with "social pragmatic disorder."   Further, the Psychological Report indicates

that Plaintiff's high school teachers felt "that Michaela will continue to need support with

social skills including making eye contact, speaking clearly and navigating social situations,"

and her mother reported that Plaintiff's "weaknesses include not knowing how to approach

people and having difficulty making friends" and"might have difficulty self-advocating at the

college level."   At most, the cited portions of this report indicate that people close to Plaintiff

had observed Plaintiff's difficulty in communicating and conducting herself in social

circumstances, and her mother opined that she might have difficulty self-advocating in

college.  But despite Plaintiff's argument to the contrary, these representations in the

Psychological Report, read either singularly or in the context of the entire report, would not

lead a reasonable college or law enforcement official to conclude that Plaintiff's conduct of

following Prof. Meehan down the hallway's and hiding when Prof. Meehan turned around,

repeatedly waiting outside of Prof. Meehan's office or classroom and not responding when

spoken to, placing calls to Prof. Meehan and remaining silent when answered, and

communicating with Prof. Meehan through a fictitious email account falsely represented to

be from Plaintiff's mother, were merely manifestations of Plaintiff's disabilities.

Moreover, the conduct in issue occurred during Plaintiff's second semester at HVCC

after Plaintiff successfully completed her first semester, including a course with Prof.

Meehan.  When viewed in this context, a reasonable factfinder could not conclude that

officials at HVCC improperly discounted or ignored Plaintiff's documented disability

assessment when a determination was made by Public Safety officers to arrest her.

Further, as Defendants argue, an accommodation which requests "to educate

[Defendants] about [Plaintiff's] disability or to help them better understand the nature of their

concerns about [Plaintiff]—is [] unreasonable as a matter of law." *McElwee,* 700 F.3d at

645.  "This proposed accommodation does not even purport to address [Plaintiff's]

inappropriate behavior; instead, it simply demands that others be more tolerant.  Requiring

others to tolerate misconduct, however, is not the kind of accommodation contemplated by

the ADA." *Id.*  Likewise, a "requested accommodation that simply excuses past misconduct

is unreasonable as a matter of law." *Id.*, at 641.

The ADA and the Rehabilitation Act do not restrict a college from disciplining

inappropriate behavior, even if that behavior allegedly was caused by the student's

disability. To the contrary, both statutes "permit [a college] to discipline a student even if the student's misconduct is the result of disability." *Tylicki v. St. Onge*, 297 F. App'x 65, 67 (2d Cir. 2008) (affirming dismissal of ADA and Section 504 claims, since the college was entitled to discipline student "even if his conduct was a manifestation of his alleged disability")(citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 172 (2d Cir. 2006)); *accord, McElwee*, 700 F.3d at 644, 645-46 (conduct "reasonably perceived by others as inappropriate," even if resulting from a disability, is non-discriminatory justification for discipline).

For these reasons, Plaintiff's ADA and Rehabilitation Act claims arising from her arrest are dismissed.

### b. False Arrest/False Imprisonment/4th Amend. Unlawful Seizure  Claims

Plaintiff brings claims for false arrest, false imprisonment, and unlawful seizure under federal and state law arising from her May 6, 2014 arrest.  Defendants contend that these claims must be dismissed because there existed probable cause for Plaintiff's arrest.

In the context of a motion for summary judgment, false arrest claims and false imprisonment claims are "identical" under New York law. *Kilburn v. Vill. of Saranac Lake*, 413 F. App'x 362, 363 (2d Cir. 2011).  Similarly, a false arrest claim is "substantially the same" as a claim under the Fourth Amendment for arrest without probable cause. *Morris v. Silvestre*, 604 F. App'x 22, 24 (2d Cir. 2015).  Thus, Plaintiff's false arrest, false imprisonment, and related Section 1983 claim for "unreasonable seizure" will be analyzed together.

"[T]he existence of probable cause to arrest constitutes justification and is a

complete defense to an action for false arrest, whether the action is brought under state law or under § 1983." *Weyent v. Okst*, 101 F.3d 845, 852 (2d Cir.1996); *see also Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) ("A § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest."); *Zanghi v. Vill. of Old Brookville*, 752 F.2d 42, 45 (2d Cir.1985)(the existence of probable cause is a complete defense to a claim of false imprisonment). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 593, 160 L. Ed. 2d 537 (2004). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id.*, 543 U.S. at 153. "And whether the substance of the information known to the officer is *actually true* is also irrelevant; all the court need decide is 'whether the officer had probable cause to believe' that the person committed a crime." *Benn v. Kissane*, 510 F. App'x 34, 37 (2d Cir. 2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S .Ct. 795, 157 L. Ed.2d 769 (2003) (emphasis added in *Benn*).

> Although determining what the officer knew at the relevant time is an issue of fact, whether those known circumstances satisfy the probable-cause standard is a mixed question of law and fact, *see* [*Ornelas v. United States*, 517 U.S. 690, 696-97, 116 S. Ct. 1657, 134 L. Ed.2d 911 (1996)], and "'[t]he ultimate determination of whether probable cause ... existed is essentially a legal question,'" *Hui Lin Huang v. Holder*, 677 F.3d 130, 135 (2d Cir. 2012) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990)). . . .

> Accordingly, a court considering a summary judgment motion in a false-arrest or malicious-prosecution case must construe in favor of the non-moving party any factual disputes regarding what circumstances were known to the officer at the relevant time. After that, however, the court must undertake a neutral, legal analysis of whether those (assumed) circumstances satisfy the probable-cause standard. *See Jenkins v. City of New York*, 478 F.3d 76, 88

(2d Cir. 2007). In other words, the court should resolve in favor of the non-moving party any disputes about what information the officer knew, but it should neutrally determine whether that information gave rise to probable cause. An objectively reasonable police officer applying the probable-cause standard would not automatically or necessarily construe all available information in favor of a particular individual, and neither should the court.

*Id.,* at 37.

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzales v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (citing *Weyant*, 101 F.3d at 852). "It is well-established that a law enforcement official has probable cause to arrest if he [or she] received his [or her] information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000); *see Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir. 1997)("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable . . . merely because it later turns out that the complaint was unfounded."). Police officers may also rely upon information gained from other officers in making their probable cause assessment. *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); *Savino v. City of N.Y.*, 331 F.3d 63, 74 (2d Cir. 2003).

"A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego*, 820 F. Supp. 54, 55 (N.D.N.Y. 1993), *aff'd*, 52 F.3d 310 (2d Cir. 1995). "Once a police officer has probable cause, he

46

need not explore "every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 128 (2d Cir. 1997).   "[T]he eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Hahn*, 820 F. Supp. at 55 (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)).

As indicated, Plaintiff was charged with Resisting Arrest, in violation of New York Penal Law § 205.30; Stalking in the Fourth Degree, in violation of New York Penal Law §120.45 (02); and Aggravated Harassment in the Second Degree, in violation of New York Penal Law § 240.30 (01).  Because the relevant inquiry is whether "probable cause existed to arrest a defendant" and not "whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest," *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006), the Court need only determine whether probable cause existed for any charge.  For reasons discussed below, the Court finds there was probable cause to arrest Plaintiff on May 6, 2014 for Stalking in the Fourth Degree and for Aggravated Harassment in the Second Degree.

### 1.  Stalking in the Fourth Degree

New York Penal Law §120.45 (02) provides, in pertinent part:

A person is guilty of stalking in the fourth degree when he or she intentionally, and for no legitimate purpose, engages in a course of conduct directed at a specific person, and knows or reasonably should know that such conduct:

> 2. causes material harm to the mental or emotional health of such person, where such conduct consists of following, telephoning or initiating communication or contact with such person, a member of such person's immediate family or a third party with whom such person is acquainted, and the actor was previously clearly informed to cease that conduct.

N.Y. Penal L. §120.45 (02).

47

The undisputed facts indicate that on April 24, 2014, Off. Denio responded to a complaint from Prof. Meehan that Plaintiff was in the hallway outside her office and would not respond when asked if she needed anything.  Off. Denio instructed Plaintiff that she could not "hang out" in an area outside where Prof. Meehan was located, she could not continue to follow Prof. Meehan, and cautioned Plaintiff that if she continued to follow Prof. Meehan she could face disciplinary action.  Off. Denio's instructions to Plaintiff were sufficient to notify Plaintiff that Prof. Meehan wanted Plaintiff to cease following and spying on Prof. Meehan.  Indeed, Plaintiff testified that on April 24, she was told to stop "stalking" Prof. Meehan.  Off. Miller-Kalbfiesh was aware of Off. Denio's instructions to Plaintiff when she arrested Plaintiff on May 6.

Furthermore, on April 28, 2014,  Off. Miller-Kalbfiesh responded to a complaint from Prof. Meehan indicating that Plaintiff was alone in a room across from Prof. Meehan's office, was peering around the corner at Prof. Meehan, and would not leave.  Off. Miller-Kalbfiesh told Plaintiff that she needed to leave the area and could not remain in a room near Prof. Meehan's office.  Off. Miller-Kalbfiesh's instructions to Plaintiff were sufficient to notify her that Prof. Meehan wanted her to cease her conduct of being around and watching Prof. Meehan for no legitimate purpose.

On April 29, 2014, Plaintiff appeared at a meeting attended by various HVCC officials including Dr. Popovics, Ms. Martocci, and Public Safety Director Aliberti.  At this meeting, Ms. Martocci explained that Prof. Meehan was uncomfortable when Plaintiff followed her.  Mr. Aliberti explained the term stalking, and directed Plaintiff to stop her behavior and indicated that the next action would be an arrest if she continued.  Plaintiff was issued a Warning Letter that indicated that continue stalking of Prof. Meehan would result in

48

appropriate sanctions, including criminal charges.  Before Plaintiff's arrest, Off. Miller-Kalbfiesh spoke with Dir. Aliberti about Aliberti's decision to arrest Plaintiff for stalking if her conduct did not cease.

On May 1, 2014, in response to Plaintiff's email, Prof. Meehan indicated: "Please do not email me as I need to devote my time to the students in my courses."  Despite this request to stop emailing her, Plaintiff emailed Prof. Meehan three more times on May 1, 2014, once on May 3, 2014 from her own account, and once on May 3, 2014 from an account that was falsely represented to belong to Plaintiff's mother.  Off. Miller-Kalbfiesh was aware of these emails before she arrested Plaintiff.

On May 6, 2014, Prof. Meehan submitted statements to the Department of Public Safety detailing Plaintiff's actions and their negative impact upon Prof. Meehan's mental, emotional, and physical health, and indicating that the conduct had continued despite Plaintiff being told to stop emailing her and to stop engaging in conduct that violated the parameters of acceptable behavior as set forth by the college.  Off. Miller-Kalbfiesh was aware of these statements before she arrested Plaintiff on May 6, 2014.

On May 6, 2014, Off. Miller-Kalbfiesh encountered Plaintiff outside Prof. Meehan's office.  As indicated, Plaintiff had been repeatedly instructed not to loom near Prof. Meehan for no legitimate purpose.  While Plaintiff now contends that she was at Prof. Meehan's office on May 6 because she was attempting to turn in the final exam, Plaintiff did not advise Off. Miller-Kalbfiesh of this fact but rather remained silent.

These undisputed facts were sufficient for Off. Miller-Kalbfiesh to conclude that she had probable cause to arrest Plaintiff on May 6, 2014 for Stalking in the Fourth Degree, in violation of New York Penal Law §120.45 (02).  Even though the accusatory instrument

based the Stalking charge only on conduct that occurred on April 24 and 28, 2014, the relevant inquiry is whether the arresting officer had valid  probable cause to arrest the suspect on any charge. *Jaegly*, 439 F.3d at 154.

Based upon the undisputed facts as set forth above,  Off. Miller-Kalbfiesh had valid basis to conclude that Plaintiff engaged in an intentional course of conduct occurring from April 28, 2014 up to and including May 6, 2014 which created a reasonable likelihood of fear of harm in Prof. Meehan. *See People v. Todd*, 57 Misc. 3d 157(A) (N.Y. App. Term. 2017)("An element of the offense is that the defendant intentionally engaged in a 'course of conduct,' which, while not defined in the Penal Law, has been construed to mean 'a pattern of conduct composed of a series of acts over a period of time ... evidencing a continuity of purpose.' Further, the conduct must be viewed as a whole and not evaluated as a separate act in each occurrence. In the stalking context, 'continuity of purpose' is not the intent to cause a particular fear of harm but to commit acts which create a reasonable likelihood of fear of harm.")(Interior quotation marks and citations omitted); *People v. Coveney*, 50 Misc. 3d 1, 7, 21 N.Y.S.3d 523, 527 (N.Y. App. Term. 2015)("[A]lthough defendant was not alleged to have made any verbal threats, the sheer volume of her attempts at communicating with McDonald make defendant's course of conduct one which was likely to have caused reasonable fear of material harm to McDonald's safety.")(citation omitted); *People v. Romero*, 50 Misc. 3d 1202(A), 28 N.Y.S.3d 650 (N.Y. Crim. Ct. 2015) ("An implied threat can derive from a variety of factors beyond the defendant's words; among them are physical proximity or trespass.").  Although Plaintiff argues throughout this case that her conduct was a manifestation of her disabilities, for the reasons discussed above with regard

to her ADA and Rehabilitation Act claims arising from her arrest, Plaintiff's disabilities do not provide a valid basis to excuse her conduct or grant her immunity from prosecution when she violates the law.

Off. Miller-Kalbfiesh also had a sufficient basis to conclude that the alleged course of conduct of looming around Prof. Meehan's office and classroom without speaking to her, following Prof. Meehan down the hall without speaking to her, and repeatedly calling her on the telephone without speaking to her, served no legitimate purpose. *See People v. Kwas*, 52 Misc. 3d 52, 55, 36 N.Y.S.3d 772, 775 (N.Y. App. Term.), *leave to appeal denied*, 28 N.Y.3d 932, 63 N.E.3d 80 (2016)("The statute's requirement that the defendant's conduct have "no legitimate purpose' means the absence of a reason or justification to engage someone, other than to hound, frighten, intimidate or threaten. ") (citing *People v. Stuart*, 100 N.Y.2d 412, 428, 765 N.Y.S.2d 1, 797 N.E.2d 28 (N.Y. 2003)).   Further, based on the repeated instructions given to Plaintiff from April 24, 2014 to May 1, 2014 to stop stalking Prof. Meehan, stop communication and interaction with Prof. Meehan that served no legitimate basis, and stop emailing Prof. Meehan, Off. Miller-Kalbfiesh had a valid basis to conclude that Plaintiff was clearly instructed to cease her behavior.  Still further, Prof. Meehan's statements given to the Department of Public Safety and reviewed by Off. Miller-Kalbfiesh provided a valid basis to conclude that Plaintiff's continued conduct actually caused material harm to the mental or emotional health of Prof. Meehan.  Finally, in light of Plaintiff's repeated conduct that was taken for no apparent legitimate purpose, and given the repeated directions and warnings to Plaintiff to cease such conduct, it was reasonable for Off. Miller-Kalbfiesh to conclude that Plaintiff knew, or reasonably should have known, that her conduct would cause material harm to the mental or emotional health of  Prof.

51

Meehan.

For these reasons,  Off. Miller-Kalbfiesh had probable cause on May 6, 2014 to arrest Plaintiff for Stalking in the Fourth Degree in violation of New York Penal Law §120.45 (02).

### 2.  Aggravated Harassment in the Second Degree

 Off. Miller-Kalbfiesh also had probable cause on May 6, 2014 to arrest Plaintiff for Aggravated Harassment in the Second Degree in violation of N.Y. Penal Law § 240.30(1).

On May 13, 2014, the New York Court of Appeals held unconstitutional N.Y. Penal Law § 240.30(1). *See People v. Golb*, 23 N.Y.3d 455, 466-68, 991 N.Y.S.2d 792, 800-01 (2014).  However, "[t]he New York Court of Appeals' decision in *Golb . . .* does not alter the analysis of probable cause.  *Golb* was decided after the plaintiff's arrest.  The violation of a presumptively valid statute that is later found unconstitutional supports a finding of probable cause."  *Leibovitz v. City of New York*, No. 14CIV3297RAJCF, 2016 WL 3671232, at *5 (S.D.N.Y. Mar. 17, 2016), *report and recommendation adopted*, No. 14-CV-3297 (RA), 2016 WL 3661530 (S.D.N.Y. July 1, 2016), *appeal dismissed* (2d Cir. Oct. 7, 2016)(citing *Michigan v. DeFillippo*, 443 U.S. 31, 37-38 (1979); *Vives v. City of New York*, 405 F.3d 115, 117-18 (2d Cir. 2004)).  At the time of Plaintiff's arrest, "New York Penal Law § 240.30(1)(a) provided that '[a] person is guilty of aggravated harassment in the second degree when, with intent to harass, annoy, threaten or alarm another person, he or she ... communicates with a person ... in a manner likely to cause annoyance or alarm.'" *Id.*, (quoting N.Y. Penal Law § 240.30).

There is no dispute in this case that Plaintiff called Prof. Meehan several times and

remained silent during these calls, including on May 4, 2014 when Plaintiff placed a call from her brother's cell phone, did not say anything, remained on the line for one minute, and then hung up.   Def. Ex. 4, p. 49.  Further, the evidence is undisputed that Plaintiff was warned against communication with Prof. Meehan that served no legitimate purpose, and Prof. Meehan stated in her Supporting Statement that Plaintiff had been warned against such conduct as calling her and remaining silent on the telephone call. *See* Def. Ex. 32. Further, Prof. Meehan indicated in her Supporting Statement that Plaintiff's behaviors were causing her physical, emotional, and mental distress. *Id.*

This evidence provides a sufficient basis for Off. Miller-Kalbfiesh to conclude that she had probable cause to arrest Plaintiff for Aggravated Harassment in the Second Degree. *See Silver v. Kuehbeck*, 217 Fed. Appx. 18, 22 (2d Cir. 2007) ("[A]fter [plaintiff's] 'agitation had grown to anger' ... he attempted to contact [defendant] and left messages 'about her evident lack of consideration and disrespect' .... Such undisputed facts clearly establish the elements of aggravated harassment, N.Y. Penal Law § 240.30(1).... "); *Leibovitz*, 2016 WL 3671232, at *5 ("According to Detective Valle's statement, the plaintiff called Ms. Gardner and left her numerous voice messages wherein he threatened to sue her, which actions 'caused Ms. Gardner annoyance and alarm.' Those allegations are sufficient to establish probable cause [to arrest for Aggravated Harassment in the Second Degree]."); *Dzwonczyk v. Syracuse City Police Department*, 710 F. Supp. 2d 248, 266 (N.D.N.Y. 2006) (finding "repeated unwanted written and verbal communications," which "persisted, despite Plaintiff having been twice contacted by police regarding the matter," established probable cause for second degree aggravated harassment).   Thus, Off. Miller-Kalbfiesh had probable cause to

arrest Plaintiff on May 6, 2014 for Aggravated Harassment in the Second Degree.

### 3. Conclusion, Probable Cause to Arrest

For these reasons, the Court finds that Plaintiff's arrest on May 6, 2014 was made

with probable cause. Because probable cause existed for Plaintiff's arrest, Plaintiff may not

maintain false arrest, false imprisonment, and unlawful seizure claims against any

Defendant. Accordingly, Plaintiff's false arrest, false imprisonment, and unlawful seizure

claims are dismissed.

### c. Malicious Prosecution Claims

Defendants also move to dismiss Plaintiff's malicious prosecution claims. To prove

her claim for malicious prosecution under both state law and Section 1983, Plaintiff must

establish: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2)

termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing

the proceeding; and (4) actual malice as a motivation for defendant's actions." *Morris v.*

*Silvestre*, 604 F. App'x 22, 24 (2d Cir. 2015); *Martinez v. City of Schenectady*, 97 N.Y.2d 78,

84 (N.Y. 2001). "In addition, a plaintiff must allege a violation of rights pursuant to the

Fourth Amendment that resulted in 'a sufficient post-arraignment deprivation[ ] of liberty.'"

*Thomas v. City of Troy*, No. 117CV0626GTSDJS, 2018 WL 1441301, at *7 (N.D.N.Y. Mar.

22, 2018)(quoting *Ying Li v. City of New York*, 246 F. Supp.3d 578, 604-05 (E.D.N.Y.

2017)).

Like false arrest, probable cause is a complete defense to a malicious prosecution

claim. *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013); *Fabrikant v. French*, 691 F.3d

193, 215 (2d Cir. 2012); *see Kilburn*, 413 F. App'x at 364. "Although [the Second Circuit]

54

has hinted in a nonprecedential order that exculpatory circumstances discovered after an arrest can dissolve probable cause to prosecute, probable cause to arrest is generally construed as probable cause to prosecute as well." *Kilburn*, 413 F. App'x at 364.  This probable cause is evaluated based on the information available to the officer at the "outset of the prosecution." *Benn*, 510 F. App'x at 36.  The record does not support a conclusion that exculpatory circumstances were discovered after Plaintiff's arrest such to dissolve probable cause to prosecute her for Stalking in the Fourth Degree or for Aggravated Harassment in the Second Degree.  Thus, probable cause existed at the time Plaintiff's prosecution commenced.

Further, "[i]n the malicious prosecution context, the element of actual malice requires proof that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Jones v. Meehan*, No. 14 CIV. 6402 (KPF), 2018 WL 459662, at *13 (S.D.N.Y. Jan. 16, 2018)(interior quotation marks and citations omitted).  The record contains no evidence that any Defendant acted with actual malice.

For these reasons, Plaintiff's malicious prosecution claims are dismissed as to all Defendants.

### d.  Intentional and Negligent Infliction of Emotional Distress Claims

Defendants move to dismiss Plaintiff's intentional and negligent infliction of emotional distress claims.  "[A] cause of action for either intentional or negligent infliction of emotional distress must be supported by allegations of conduct by the defendants 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and

to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Sheila C. v. Povich*, 11 A.D.3d 120, 130-131 (1st Dept. 2004) (quoting *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 448 N.E.2d 86 (1983)).  None of the conduct by any of the Defendants was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, or that could be regarded as atrocious, and utterly intolerable in a civilized community.  Accordingly, Defendants' motion to dismiss these claims is granted.

### f.  Motion to Strike Expert Report and Preclude Testimony

Defendants seek to exclude the expert testimony of Bruce Adelson.  They argue that he is not qualified to offer testimony about accommodating disabilities in an educational setting and that his proposed testimony offers legal conclusions, misstates the applicable law, and would not be helpful to the jury.  Federal Rule of Evidence 702 "governs the admissibility of expert testimony."  *Showers v. Pfizer, Inc.*, 819 F.3d 642, 658 (2d Cir. 2016).  That Rule permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education" to "testify in the form of an opinion" under certain conditions.  FED. R. EVID. 702.  To be qualified to testify, the "expert's scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence or to determine a fact in issue."  FED. R. EVID.  702(a).  In addition, "the testimony" must be "based on sufficient facts and date" and be "the product of reliable principles and methods."  FED. R. EVID. 702(b)-(c).  Finally, the expert must have "reliably applied the principles and methods to the facts of the case."  FED. R. EVID. 702(d).  "The proponent of the testimony has burden to establish these admissibility requirements."  Showers, 819 F.3d at 642.

A district court has "broad discretion" in evaluating expert testimony.   *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995).   In carrying out its role as gatekeeper, a court must take a "flexible" approach that focuses on "the scientific validity–and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 594-95 (1993).   The Court is to concentrate only on "principles and methodology," and "not on the conclusions that they generate."   Id. at 595.   Of course, "the types of factors to consider" in evaluating expert testimony "will 'depend upon the particular circumstances of the particular case at issue[.]'"   *Showers*, 819 F.3d at 658 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).   The trial court's role is as "'gatekeeper," making sure "that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Id.* (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).   "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]"   *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).   In determining whether the expert has the qualifications to testify, the Court's role, "whether a witness's area of expertise was technical, scientific, or more generally 'experienced-based," is to "'[make] certain that the expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."   *Id.* at 396.

Once a court determines that an expert is qualified to testify, "Rule 702 imposes on the trial judge an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, i.e., will be not only relevant, but reliable."   *United States v. Romano*,

57

794 F.3d 317, 330 (2d Cir. 2015).  "Expert testimony should be excluded where it is 'speculative or conjectural,' but arguments that the expert's assumptions 'are unfounded go to the weight, not the admissibility, of expert testimony.'"  *Robinson v. Suffolk County Police Dep't*, 544 Fed. Appx. 29, 32 (2d Cir. 2013) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).  In determining whether expert testimony will assist the trier of fact, a court must be careful to remember that such testimony may not either "'usurp the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it[.]'"  *Nimely*, 414 F.3d at 397 (quoting *United States v. Blizerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  The testimony should not attempt to "'tell the jury what result to reach'" or "'substitute the expert's judgment for the jury's.'"  *Id.* (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

Bruce L. Adelson claims an expertise in "the accessibility of organizations to people with disabilities . . . the accessibility of organizations' communications, programs, services, physical structures, websites, and other activities to people with disabilities."  *See* Exh. A to Defendants' Motion, Adelson's Expert Report ("Report"), dkt. # 62-3, at ¶ 2.  He also claims expertise in "best practices and federal regulatory expectations for organizations to accessible to disabled people" as well as expertise "in federal civil rights investigations and techniques concerning discrimination claims and in assessing, evaluating, and investigating claims of discrimination."  *Id.*  Adelson worked as a Senior Trial Attorney and Attorney Advisor for the United States Department of Justice's Civil Rights Division from 2000-2006.  *Id.* at ¶ 3.  His work in that position involved evaluating organizations' accessibility to people with disabilities, as well as with the techniques of investigating claims of discrimination,

including discrimination based on disability. *Id.* at ¶ 4. Part of his service included insuring accessibility at polling places. *Id.* at ¶ 6. Since leaving that position in 2006, Adelson has served as a consultant, offering assessments of accessibility "for many organizations, including but not limited to non-profits, community and disability rights advocacy organizations, restaurants, state and local governments, airports, courts, language services companies, secondary and post-secondary schools, and health care providers[.]" *Id.* at ¶ 7. Adelson has trained organizations, including secondary and post-secondary schools, on providing access to disabled people, including the need to provide comprehensive staff training on the sisue. *Id.* at ¶¶ 8-9. He has consulted with numerous organizations, including schools, about accessibility for disabled people. *Id.* at ¶¶ 10-11. He gives regular speeches on this topic. *Id.* at ¶ 12. Adelson has served as an expert in two federal cases involving voting rights. *Id.* at ¶ 15. The judge in one of those cases struck his report. *Id.* He has served as an expert but not testified in other cases involving disability under the ADA, the Rehabilitation Act and the Fair Housing Act. *Id.* Adelson is an attorney. *Id.* at ¶ 13. He has no other relevant academic training.

The Court finds that Adelson's education and experience qualify him to testify about whether HVCC made its programs and offerings accessible to Plaintiff despite her disability. While Defendants correctly point out that Adelson has not testified in the area of access to education for people with disabilities, he has experience with the operation of the ADA and the ways that organizations—including colleges and universities—best ensure that persons with disabilities have access to their programming. The Court will therefore deny the Defendants' motion in that respect.

59

Defendants also criticize the conclusions in Adelson's report for – among other reasons – offering legal conclusions and for failing to address the relevant questions in this matter.  The Court finds that these criticisms are logically criticisms about the persuasiveness of the report, which can be addressed in cross-examination and argument to the jury.  To the extent that individual portions of Adelson's testimony may be inadmissible, the Court finds that objections to those portions are best handled by permitting Defendants to object to testimony proffered at trial.

The Court will therefore deny the motion to strike Adelson's report and preclude his testimony with leave to renew at an appropriate point during trial.

## V.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment [dkt., # 55] is GRANTED in part and DENIED in part.  The motion is granted in that all claims in this matter against all Defendants, *except* Plaintiff's claims against Defendant Hudson Valley Community College under the ADA and the Rehabilitation Act alleging a denial of an accommodation for extra time to take the missed tests in the Principles of Marketing class, are DISMISSED.  The  claims against Defendant Hudson Valley Community College under the ADA and Rehabilitation Act alleging a denial of an accommodation for extra time to take the missed tests in the Principles of Marketing class will be set by the Clerk for trial.

Defendants' motion to strike Plaintiff's expert's report and preclude the expert from testifying [dkt. # 62] is DENIED.

**IT IS SO ORDERED.**

Dated:  March 30, 2018

Thomas J. McAvoy
Senior, U.S. District Judge

60